IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TEXTRON INC., | § | |
| | § | |
| | § | No. 204, 2014 |
| Plaintiff-Below, | § | |
| Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | in and for New Castle County |
| ACUMENT GLOBAL | § | C.A. No. N10C-07-103 JRJ CCLD |
| TECHNOLOGIES, INC., | § | |
| | § | |
| Defendant-Below, | § | |
| Appellee. | § | |

Submitted: January 14, 2015
Decided: January 23, 2015

Before **STRINE**, Chief Justice; **HOLLAND** and **VAUGHN**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Denise S. Kraft, Esquire, Laura D. Hatcher, Esquire, Brian A. Biggs, Esquire, DLA Piper LLP, Wilmington, Delaware; Donald J. Wolfe, Jr., Esquire (*argued*), Arthur L. Dent, Esquire, Potter Anderson & Corroon LLP, Wilmington Delaware; John A. Tarantino, Esquire, Adler Pollock & Sheehan P.C., Providence, Rhode Island, for Appellant.

C. Barr Flinn, Esquire (*argued*), Tammy L. Mercer, Esquire, Benjamin Z. Grossberg, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Appellee.

**STRINE**, Chief Justice:

# I. INTRODUCTION

Textron, Inc. appeals from a judgment by the Superior Court holding that the company is not entitled to reimbursement from its former fastening manufacturing business, now known as Acument Global Technologies, Inc. ("Acument"), for paying certain pre-closing contingent liabilities in the United States.[1] The Superior Court's opinion centered on the meaning of a "tax benefit offset" provision in the parties' Purchase Agreement under which Acument was required to reimburse Textron if Acument received a "tax benefit" related to the contingent liabilities. The Superior Court rejected Textron's interpretation of the Agreement that Acument only needed to be hypothetically able to take advantage of a tax benefit to trigger the offset, in the sense that any step-up in Acument's tax basis constituted a benefit even if the overall effect of the transaction was tax-neutral because of an off-setting step-down. Textron claims not to appeal that aspect of the Superior Court's ruling, but argues that even if the tax benefit has to be actual rather than merely hypothetical, the Superior Court erred by not finding that Acument actually enjoys the right to tax benefits. Textron contends that its payment of the pre-closing liabilities constitutes a tax benefit because the payments automatically increase Acument's tax basis under U.S. tax law.

But, as Acument points out, the increase in Acument's basis is fully offset by a simultaneous decrease because Textron, not Acument, paid the liabilities per the parties' Agreement. In other words, the Agreement, taken as a whole as it must be, guaranteed

---

[1] *Textron, Inc. v. Acument Global Technologies, Inc.*, 2014 WL 2903060 (Del. Sup. Mar. 25, 2014) [hereinafter Opinion].

1

that Acument would not receive a net tax benefit simply because Textron made a required indemnification payment. Accordingly, Textron's argument that Acument has received a tax benefit triggering Textron's right to reimbursement is without merit, as the total effect of Textron's payments is tax-neutral.

Similarly, Textron's second and related claim that the Superior Court erred in "redefining" the required tax benefit to mean only a "deduction" rather than any "reduction" is meritless. The Superior Court made clear that it intentionally used the term "deduction" in the opinion solely to reflect the language used by both parties to describe what the Purchase Agreement required. The Superior Court also limited its determination that the required tax benefit must be a deduction to the claims that are specific to this case, and thus did not prejudice Textron's right to receive offsets for unrelated non-deduction reductions. We therefore affirm the judgment below.

## II.    BACKGROUND[2]

### A.  The Parties

Textron is a $12 billion Delaware corporation that operates in a wide variety of industries, including aircraft manufacturing, defense, and related financial services.[3] In 2006, Textron sold its global fastening manufacturing business segment to a subsidiary of a private equity firm, Platinum Equity, LLC,[4] which renamed the business from Textron

---

[2] The uncontested facts are drawn from the decision of the Superior Court below, as well as the record and the briefs submitted by the parties.

[3] *Textron: Our Company*, http://www.textron.com/about/company/index.php (last visited Dec. 23, 2014).

[4] Textron sold the business to TFS Acquisition Corp., which was wholly owned by Platinum Equity. TFS Acquisition Corp. became Acument after the purchase.

Fastening Systems to Acument.[5] Platinum Equity was founded in 1995, and has since acquired more than 150 companies across many industries.[6] For sake of simplicity, we refer to the parties involved as Textron and Acument, and only reference Platinum Equity when the distinction between Platinum Equity and Acument is relevant.

### B. The Sale Process

In 2005, Textron decided to sell its global fastening systems business segment through a two-stage competitive auction. In the first stage, potential buyers who signed a nondisclosure agreement were granted access to due diligence. In the second stage, Textron selected a subset of potential buyers to participate in an auction. Platinum Equity made an initial bid of $900 million in early March 2006.

As Textron continued discussions with other potential buyers in the spring of 2006,[7] Textron and Platinum Equity negotiated price and various provisions of the proposed Purchase Agreement. The Purchase Agreement was based on a bid draft crafted by Textron before it identified specific potential buyers. In the draft, Textron

---

[5] After this litigation began, Platinum Equity sold Acument to Fontana Gruppo. *See Platinum Equity Sells Acument to Fontana Gruppo*, June 23, 2014, http://www.platinumequity.com/news/907/platinum-equity-sells-acument-to-fontana-gruppo. Textron filed a motion on July 24 requesting that we take judicial notice of the sale. This Court denied the motion on July 28, but granted Textron leave to address the issue in its reply brief, and entitled Acument to file a sur-reply brief in response. Because there is no dispute that Platinum Equity always intended to "flip" Acument, and the substantive arguments presented do not hinge on when a taxable benefit would accrue to Acument, only if there is such a benefit, it does not matter whether or not we take judicial notice of the sale. Further, according to Acument, only the equity of Acument's parent company was sold, so any change in Acument's basis since the sale from Textron is still unrealized. Sur-Reply Br. at 3.

[6] *The Firm: About Platinum Equity*, http://www.platinumequity.com/company (last visited Dec. 21, 2014).

[7] Indeed, negotiations between Textron and Platinum Equity were suspended for a short period of time in early May because Textron entered into an exclusivity contract with another bidder. Opinion at *5.

3

agreed to indemnify the buyer for certain pre-closing liabilities ("Losses"), including those related to tax in § 4.6(h)(ii), specified breaches by Textron in § 6.1(b)(i-ii), environmental issues in § 6.1(b)(iii), and retained litigation in § 6.1(b)(iv). But under § 6.1(d), the buyer was required to "reduce[]" any loss to Textron by reimbursing it for insurance proceeds, payments by third parties, or – most relevant to this litigation – "(iii)(C) any Tax Benefit of the [buyer] attributable to such Loss."[8] "Tax Benefit" is later defined in the Agreement as:

> the present value of any *refund, credit or reduction* in otherwise required Tax payments, including interest payable thereon, which present value shall be computed as of the Closing Date or the first date on which the right to the refund, credit or other Tax reduction arises or otherwise becomes available to be utilized . . . assuming that such refund, credit or reduction shall be recognized or received in the earliest possible taxable period (without regard to any other losses, deductions, refunds, credits, reductions or other Tax items available to such party).[9]

Asserting that § 6.1(d)(iii)(C) was "very seller friendly" and risked requiring an offset even when it had not accrued "actual tax savings [that] year," Platinum Equity first proposed eliminating the provision.[10] Textron rejected that change. Platinum Equity then proposed changing the definition of "Tax Benefit" to "actual tax savings . . . in the first taxable year in which an item is properly includible in a tax return." Textron again rejected the suggestion. But these proposed revisions were among many made by Platinum Equity during the negotiations process, and the Superior Court determined that

---

[8] App. to Opening Br. at 123 (Purchase Agreement § 6.1(d)(iii)(C)).
[9] App. to Opening Br. at 142 (Purchase Agreement § 8.1) (emphasis added).
[10] Opinion at *4.

4

that neither party considered the scope of the tax benefit offset to be a material issue.[11] The relevant provisions in the final contract thus remained materially unaltered from the bid draft.[12] After extensive negotiations about a number of issues, including responsibility for outstanding contingent liabilities, the parties agreed on a final purchase price of $630 million and executed the Purchase Agreement on August 11, 2006.[13]

### C. Tax Issues

To transfer Textron's entities based in the U.S., the parties structured the transactions as "deemed asset sales."[14] Under § 338(h)(10) of the Internal Revenue Code,[15] parties in certain transactions can jointly elect to have a stock sale treated as an asset sale for tax purposes. The tax benefits of that election can be material, depending on the difference between the seller's asset basis and its stock basis. In a typical stock sale, the buyer obtains assets with a carryover basis, *i.e.*, the seller's former asset basis. For its part, the seller is unable to use any of its net operating losses attributable to the entity, as those remain with the entity and thus go to the buyer. By contrast, in a typical asset sale, the buyer gets an increased or stepped-up basis equal to the purchase price, but

---

[11] Opinion at *23.

[12] Opinion at *6.

[13] The reason for the price drop from Platinum Equity's initial offer of $900 to $630 million was disputed by the parties at trial. Textron argued that the decrease represented Platinum Equity's agreement to share the pre-closing liabilities; Acument countered that the first offer represented an outsider's view of the value of the entity, but once Platinum Equity had access to internal documents, it was clear the business was worth less than $900 million. The Superior Court found that "[t]here were several variables involved in the ultimate sale price, and the Court is not persuaded that a partial indemnification agreement was one of those variables." Opinion at *24.

[14] The sale involved entities in approximately 25 countries; the non-U.S. entities were sold through stock sales. Opinion at *7.

[15] 26 U.S.C. § 338(h)(10).

5

the seller is faced with an immediate tax bill for any increase in its basis. Just as in a stock sale, the net operating losses remain with the entity.

By structuring the deal as a deemed asset sale, both the buyer and seller benefited: Acument got a stepped-up basis equal to the fair market value of the stock (that is, its basis equals the purchase price), and Textron was not taxed on the stock sale.[16] Textron was still liable for any increase in its asset basis as if the transaction was an asset sale, but any gains could be offset by losses, including those attributable to the subsidiary. And because the deemed asset sale operates like a liquidation of the entity being sold, the proceeds from the "liquidation" were tax-free to Textron, meaning that its stockholders faced only one level of tax.[17] Typically the buyer in a deemed asset sale assumes all tax liabilities for the acquired entity, but here Textron agreed to indemnify Acument for certain contingent tax liabilities.[18]

One consequence of structuring the transaction as a deemed asset sale is that any liabilities that were contingent at the time of the sale were not accounted for in the purchase price, and thus were not accounted for in Acument's basis.[19] Going forward,

---

[16] Some of the former Textron entities in the U.S. were sold as single-member LLCs, treated as disregarded entities for tax purposes, also through deemed asset sales. *See* Opinion at *7. The tax treatment is therefore identical to that described above. *See also* App. to Opening Br. at 192 (Trial Tr. at 181-82, Apr. 25, 2013, testimony of Textron's tax expert, Stephen Gertzman) ("When you're dealing with a [disregarded entity], you get the exact same tax consequences, although you don't have explicit regulations as you do under [§ 338(h)(10)], but you do have the same tax conclusions and I believed [Acument's tax expert] Mr. Wellen and I agree on that.").

[17] *See* Reg. 1.338(h)(10)-1(d).

[18] *See* App. to Opening Br. at 121 (Purchase Agreement § 6.1(b)).

[19] Acument's tax expert presented an alternate theory at trial, that Acument never assumed responsibility for the contingent liabilities because Textron had agreed to indemnify it. Under that analysis, Acument's basis would not step up or step down when Textron paid the liabilities because they were not latently part of the purchase price. But as the expert testified, the end

though, when any of the contingent liabilities are paid,[20] Acument's tax basis will be retroactively increased as if the purchase price had been for the higher amount.[21] As a simplified example, if Textron pays a $5 million pre-closing liability, Acument's basis will automatically increase from the purchase price of $630 million to $635 million. Of critical importance to this litigation, though, Acument's basis will simultaneously decrease by $5 million – *i.e.*, go back down to $630 – because Textron made the payment on Acument's behalf.[22] As Textron's tax expert acknowledged at trial, the step up and the step down in basis are considered analytically distinct by the IRS, but the net effect is no change in basis.[23] So long as the payment of the liability occurs simultaneously with the indemnification by Textron, Acument is not entitled to deduct any amount from its taxes.[24] By contrast, Textron can deduct any payments it makes on the contingent

---

result is the same: so long as the indemnification is for the full amount of the liabilities, there is no net increase in Acument's basis. In Acument's post-trial briefing, it acknowledged the "confusion" that might result from the competing analyses, and noted that "the Court does not need to rule which analysis is correct under federal tax law as both analyses yield the exact same result." App. to Opening Br. at 292 (Acument's Post Trial Br. at 22).

[20] To use the technical terminology, payment of a contingent liability "fixes" the amount under the IRS' "all-events" test. According to IRS regulations, "a liability . . . is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." 26 C.F.R. 1.461-1(a)(2)(i).

[21] IRS regulations refer to the "adjusted grossed-up basis," or "the amount for which new target [*i.e.*, Acument] is deemed to have purchased all of its assets in the deemed purchase." 26 C.F.R. 1.338-5(a). The adjusted grossed-up basis ("AGUB," in tax parlance) is determined at the time of the acquisition, but then re-determined going forward if certain events occur, including if contingent "liabilities not originally taken into account in determining AGUB are subsequently taken into account." *Id*. at (b)(2)(ii).

[22] *See generally id*.

[23] App. to Opening Br. at 201 (Trial Tr. at 218, Apr. 25, 2013, testimony of Textron's tax expert, Stephen Gertzman, at 218).

[24] *Cf*. IRS Field Service Advice Memorandum No. 200048006 (App. to Answering Br., Ex. A). There could be a different result if Textron only partially indemnified Acument because the

7

liabilities from its own taxes as if it had never transferred the subsidiary, and the record is clear that it has done so.[25]

### D. Post-Closing Problems

Notwithstanding the high level of sophistication of everyone involved in the deal,[26] the Superior Court found that there "was a general misunderstanding between the parties as to the meaning and operation of the Tax Benefit Offset," starting "not long after the parties signed" the Purchase Agreement.[27]

As the Superior Court discussed, within a year of the sale, Textron became concerned about the mounting cost of pre-closing liabilities, especially in Brazil. By December 2006, Textron had paid approximately $500,000 in indemnity payments directly to the beneficiaries without requesting an offset from Acument. But on December 26, a Textron tax attorney circulated an email internally, wondering if Textron could request reimbursement for a "hypothetical tax benefit" from Acument under the Purchase Agreement.[28] Acument did not agree that it owed Textron any reimbursement payments: because the Brazilian entity which was accumulating liabilities carried

---

amount of the increase in basis from the liability being paid would not be identically offset by a decrease in basis from the indemnification. But there is no dispute that Textron is liable for the full amount of the contingent liabilities, so the liabilities and indemnifications always offset each other. *See* App. to Opening Br. at 121 (Purchase Agreement § 6.1(b) Indemnification by [Textron]); Opinion at 21-22. Textron seems to dispute that the two payments will always "net out," but does not explain why on the facts of this case. The only examples it cites in support of a mismatch are those involving partial indemnification. *See* Reply Br. at 12. At oral argument, Textron conceded that it was not appealing the Superior Court's judgment that Acument was entitled to full indemnification.

[25] App. to Opening Br. at 65-66 (Acument's Pre-Trial Br. at 1-2).

[26] *See, e.g.*, Opinion at *8 ("Both Textron and [Platinum Equity] have vast in-house mergers and acquisitions knowledge and experience, evidenced by the parties' own in-house groups.").

[27] Opinion at *9.

[28] *Id.*

substantial net operating losses, Acument could not receive any deductions until those losses were used up.[29] And if it could not use the deductions from indemnified loss payments, Acument did not want to pay Textron for them too.

On January 25, 2007, Textron's senior associate general counsel sent Acument's general counsel a letter "for settlement purposes only," requesting that Acument make payments to Textron to reimburse it for its payments on the contingent liabilities based on the tax benefit offset. The letter reflected Textron's position that "Acument is not required to actually save taxes for the reduction to kick in."[30] Textron's counsel sent a similar letter to Acument France. Acument initially maintained that it did not owe Textron any reimbursement, but apparently later accepted that it owed Textron offset payments. The Superior Court found that it was not clear from the record what and how much, exactly, Acument agreed to reimburse.[31] But it does not appear from the record that the primary concern was with U.S.-related liabilities at that point; the parties were focused mainly on the liabilities in Brazil.[32]

On October 24, 2007, Textron and Acument executed a Letter Agreement, which the Superior Court determined was designed to clarify the parties' respective responsibilities for the contingent liabilities under the original Purchase Agreement. The Letter Agreement referred to another document, entitled "Andrew's Open Issues

---

[29] Opinion at *9.
[30] Opinion at *10.
[31] Opinion at *10.
[32] Opinion at *11. The Superior Court, however, rejected Acument's argument that the Letter Agreement was only related to Brazil. Opinion at *20 n.241.

Summary, dated October 9, 2007," as the "base line" for discussions.[33] The "Andrew" referred to was Andrew Spacone, Textron's senior associate general counsel. As the Superior Court noted, Spacone drafted both the Letter Agreement and the original Open Issues Summary.[34] In the Letter Agreement, Acument "agreed to reimburse Textron for the hypothetical tax benefits associated with the past Loss Payments to Date."[35] The first paragraph of the Letter Agreement refers to hypothetical tax rates in Brazil and France, but does not otherwise specify which country or countries are covered.[36] Some U.S.-related liabilities were included in the $720,658 Acument agreed to pay to offset Textron's previous indemnification payments.[37]

After signing the Letter Agreement, Acument began to make reimbursement payments to Textron as claims arose, including three payments on U.S. liabilities.[38] But in April 2008, Acument's tax director apparently realized for the first time that Acument could not deduct the indemnity payments in the U.S.[39] He concluded that because Acument could not realize any actual net tax benefit in the U.S., the tax benefit offset provision of the Purchase Agreement was not triggered. Accordingly, in June 2008,

---

[33] App. to Reply Br. at 1 (Letter Agreement at 1).
[34] Opinion at *13.
[35] *Id.*
[36] *Id.*
[37] App. to Opening Br. at 73 (Acument's Pre-Trial Br. at 9). Acument did not seek reimbursement for these earlier payments before the Superior Court, characterizing them as "spilt milk." App. to Opening Br. at 74 (Acument's Pre-Trial Br. at 10 n.4).
[38] App. to Opening Br. at 95-96 (Pretrial Stipulation and Order at 5-6).
[39] Opinion at *15. According to Textron, "Acument has never seriously disputed that, outside of the U.S., Textron's indemnity is subject to the Tax Benefit Reduction." Opening Br. at 11. Acument concurred in its briefing to the Superior Court. *See* App. to Opening Br. at 85 (Acument Pre-Trial Br. at 21) ("Acument has been consistently providing Tax Benefit offsets in relevant foreign jurisdictions when requested and applicable.").

10

Acument refused to continue offsetting Textron's payments on U.S.-related claims, asserting in a letter to Textron's senior tax attorney that because Acument was not eligible for a tax benefit, the offset did not apply, and any previous U.S.-related offset payments had been made in error.[40] Acument sought reimbursement from Textron for those payments in the amount of $251,937. Textron insisted that no net tax benefit was required to trigger reimbursement, in the U.S. or elsewhere.

In January 2010, Textron's senior associate general counsel sent Acument's general counsel a letter demanding that Acument offset Textron's payments on the U.S. liabilities.[41] Textron reiterated its view that the Purchase Agreement

> does not require that Acument actually realize any net tax benefit for the reduction of indemnity payments to apply. Instead, the fact that Acument at some time in the future (or in the past) may be entitled (for whatever reason) to a tax deduction attributable to the United States claims that are indemnified by Textron . . . is enough to trigger the reduction in Textron's indemnity payments under the Purchase [and Sale] Agreement.[42]

Acument again refused to pay.[43]

### E. Litigation

Textron filed this suit in the Superior Court on July 13, 2010, seeking to enforce its alleged right to a reduction of its indemnity obligations in the amount of $2,048,414.[44] Textron argued that under § 6.1(d)(iii)(C) of the Purchase Agreement and the terms of the

---

[40] App. to Opening Br. at 103 (letter from Don Modrycki to David Stonestreet, dated June 2, 2008).

[41] Textron's letter also demanded reimbursement for "hypothetical tax benefits" in Germany and France, for a total of $2.6 million. Opinion at *15.

[42] App. to Acument Pre-Trial Opening Br. at 129 (letter from Andrew Spacone to John Clark, dated Jan. 26, 2010).

[43] Opinion at *16.

[44] App. to Answering Br. at 11 (Complaint at 5).

later Letter Agreement, it was entitled to reimbursement by Acument for any payments it made on pre-closing contingent liabilities in the amount of any tax benefit Acument has a right to receive, regardless of whether Acument actually received that benefit in net tax savings. Textron further argued that Acument enjoys the right to a tax benefit within the meaning of § 6.1(d)(iii)(C) of the Purchase Agreement solely because of the increase in its basis resulting from payment of the liabilities. Acument asserted counterclaims that were essentially the reverse of Textron's claims, including a demand for reimbursement of its earlier erroneous payments.

Textron initially moved for judgment on the pleadings, claiming that the language in the Purchase Agreement was unambiguous. Acument agreed that the Agreement was unambiguous, but disagreed on the proper interpretation of the "unambiguous" provision. The Superior Court found that the provision was "reasonably and fairly susceptible to different interpretations" and denied Textron's motion.[45]

At trial, Textron argued that the tax benefit reduction required only a hypothetical tax benefit, with or without net tax savings. Second or alternatively, Textron argued that Acument actually had the right to a benefit because Textron's payments on the pre-closing contingent liabilities provided a step-up in Acument's basis. In its view, the Purchase Agreement and Letter Agreement established that the parties intended to share liabilities, so Textron only had a partial responsibility to indemnify Acument. Textron further argued that Acument's reimbursement payments were "probative of the parties'

---

[45] *Textron, Inc. v. Acument Global Technologies, Inc.*, 2011 WL 1326842, at *6 (Del. Sup. Apr. 6, 2011).

intent."[46]  Acument countered that it was entitled to full indemnification by Textron, and only owed reimbursement to Textron if it actually received a net tax benefit.  It also contended that the Letter Agreement was not meant to apply to the U.S. liabilities, and its mistaken payments did not constitute a waiver of its arguments related to those liabilities.

### F. The Superior Court's Decision

After two years of discovery, including with the aid of a Special Discovery Master, and a four-day bench trial, the Superior Court issued a 65-page opinion on March 25, 2014.  The bulk of the opinion sets forth the facts, particularly the parties' negotiating history and post-closing conduct.  After reviewing that evidence, the Superior Court held that Textron had failed to prove its case by a preponderance of the evidence, and ruled in favor of Acument on all claims, including its counterclaims for return of its mistaken payments.

First, the Superior Court agreed with Acument that its mistaken payments to Textron did not constitute a waiver.[47]  The Superior Court next determined that the Letter Agreement was not intended to modify the Purchase Agreement, as Textron had argued.  The court thus focused on interpreting the Purchase Agreement, using the Letter Agreement as parol evidence to "clarify" the Purchase Agreement's meaning.  The court found that the language of the Purchase Agreement "does not explicitly support either side's interpretation," but "still offers guidance as to the parties' intent."[48]  In particular, the court noted that "[e]ven though the parties were aware that [Platinum Equity]

---

[46] Opinion at *17.
[47] Opinion at *19.
[48] Opinion at *21.

13

intended to 'flip' [Acument], there is no express language within the [Purchase Agreement] to support Textron's position that an increase in basis is what the . . . drafters intended to satisfy the Tax Benefit Offset."[49] Reading the contract as a whole, the Superior Court determined that the language of the Purchase Agreement did not support Textron's interpretation that a hypothetical tax benefit was sufficient or that the parties had agreed to share responsibility for the pre-closing liabilities.

But because the Superior Court held that the Purchase Agreement was ambiguous, it proceeded to look at other extrinsic evidence. The court found that the parties' conduct during and after signing the contract "also belie[d] Textron's position that the [Purchase Agreement] encompasses only partial indemnification based upon a 'hypothetical' Tax Benefit Offset."[50] The court found that the contemporaneous understanding of the Purchase Agreement, as evidenced by internal Textron communications, suggested that the parties understood the offset to apply only if Acument was able to take advantage of tax deductions on a net basis.[51]

The court also weighed the credibility of the witnesses presented by the parties, and determined that Textron's key witness, senior associate general counsel Andrew Spacone, was not credible in his depiction of the parties' negotiating history.[52] The court did not make any findings as to the credibility of the parties' tax experts, presumably because neither expert disputed that Acument cannot deduct payments made by Textron

---

[49] Opinion at *21.
[50] Opinion at *22.
[51] Opinion at *25-26.
[52] *See, e.g.*, Opinion at *12 n. 139, *25.

14

on the contingent liabilities in the U.S.,[53] and that as long as the indemnification payments are for the full amount of the liabilities, there is no net change in Acument's basis.[54] As a result, the Superior Court held that:

> (1) Textron has failed to prove by a preponderance of the evidence that the Tax Benefit Offset, as defined by the Tax Benefit definition of the [Purchase Agreement], is "hypothetical"; (2) The Tax Benefit Offset applies only when Acument is entitled to a Tax deduction based on Textron's indemnification payments; (3) Acument has not breached the [Purchase Agreement] by withholding the Tax Benefit Offset because it is not entitled to a tax deduction in the United States; (4) Textron has breached the [Purchase Agreement] by wrongfully withholding the Tax Benefit Offset on indemnity payments for which Acument does not receive a tax benefit; and (5) Textron owes Acument $251,937 for Tax Benefit Offset reimbursement.[55]

## G. Textron's Appeal

On appeal, Textron argues that the Superior Court erred in not addressing whether Acument's increase in basis constitutes a "tax benefit" for purposes of the Purchase Agreement. Textron also alleges that the Superior Court erred in construing "reduction" to mean "deduction," thereby narrowing the circumstances under which the "Tax Benefit Reduction" provision is triggered. Textron claims not to appeal the Superior Court's holding that the tax benefit reduction required an actual net tax benefit to Acument, rather than a hypothetical one.[56]

Acument contends in response that it has not received a tax benefit because its increase in basis from payment of the contingent liabilities is offset by an equal decrease

---

[53] Opinion at *7 n. 85, *18.
[54] Opinion at *18.
[55] Opinion at *27.
[56] Opening Br. at 12, n. 4.

15

in basis from the indemnification. In other words, Acument argues that to determine whether a benefit occurred, all the effects of the transaction (positive and negative) must be taken into account. It urges us to reject Textron's contention that only one effect (the positive tax effect) is relevant, and we should ignore the corresponding (negative) effect, in order to produce a "benefit." Because the net effect is in fact neutral, Acument argues that Textron is not entitled to be reimbursed for fulfilling its indemnity obligations under the Purchase Agreement. Acument points out that, contrary to Textron's argument on appeal, the Superior Court did consider Textron's argument below that Acument's increase in basis constituted a tax benefit, but rejected it. Acument also contends that the Superior Court correctly held that the benefit can be either a deduction or a reduction, but the distinction is irrelevant because the only benefit at issue is a deduction.

## III. ANALYSIS

### A. *The Superior Court Did Not Err in Finding that Acument Has Not Received the Right to a Tax Benefit Under the Terms of the Purchase Agreement*

#### 1. Standard of Review

Textron first argues on appeal that the increase in Acument's basis from the payment of the contingent liabilities constitutes an actual (non-hypothetical) tax benefit, but the Superior Court erred in failing to "address[] this potentially dispositive issue." Textron contends that because the error is a matter of law, *de novo* review is appropriate. Acument responds that because "Textron's appeal does not actually challenge the Court's determination of tax law," but instead only contests the Superior Court's interpretation of

16

the parties' contract, we should give deference to the factual findings underlying the Superior Court's interpretation in our review.[57]

Acument is correct; Textron is not challenging the Superior Court's analysis of the relevant tax law, but is instead challenging the Superior Court's interpretation of what the parties' Purchase Agreement required as a result of the relevant tax law. The question before us, as it was before the Superior Court, is not how "benefit" is defined by tax law, but how this contract defined that term. To quote Corbin on Contracts: "If the purpose of contract law is to enforce the reasonable expectations of parties induced by promises, then at some point it becomes necessary for courts to look to the substance rather than to the form of the agreement, and to hold that substance controls over form."[58] The parties do not dispute that under IRS regulations, payment of pre-closing contingent liabilities automatically increases Acument's basis. What they dispute is whether their "reasonable expectations" in signing the Purchase Agreement entailed categorizing the increase in Acument's basis as a "tax benefit," particularly when that increase is automatically offset by a decrease in basis from Textron's indemnification.

Thus, our standard of review must reflect the fact that this case presents issues of contract law, not tax law. We consider issues involving the language of the contract *de novo*, but to the extent that the Superior Court's interpretation of the contract is based on extrinsic evidence, its findings are entitled to deference "unless the findings are not

---

[57] Answering Br. at 19.

[58] CORBIN ON CONTRACTS (Kaufman Supp. 1984) § 570 (quoted in *Katz v. Oak Industries*, 508 A.2d 873, 880 (Del. Ch. 1986)).

supported by the record or unless the inferences drawn from those findings are not the product of an orderly or logical deductive process."[59]

## 2. Acument is Not Entitled to a Tax Benefit As Defined by the Purchase Agreement

As noted, the Purchase Agreement defines "Tax Benefit" as "the present value of any refund, credit or reduction in otherwise required Tax payments."[60] The Agreement then specifies how such a benefit is calculated, including in which year "such refund, credit or reduction shall be recognized."[61] The Superior Court determined that the Purchase Agreement was ambiguous because "the provisions in controversy are reasonably or fairly susceptible of different interpretations."[62] Namely, the Superior Court found that the plain language of the contract could support either Textron's interpretation entitling it to a refund for merely hypothetical benefits or Acument's interpretation requiring it to receive actual net tax benefits. The court thus denied Textron's motion for judgment of the pleadings, and considered the extrinsic evidence at trial. Based on that extrinsic evidence, including internal emails, communications between the parties, and testimony from deposition and trial witnesses, the Superior Court determined that Acument's obligation to reimburse Textron was not triggered under the Purchase Agreement unless Acument received an actual net tax benefit.

---

[59] *Honeywell Intern. Inc. v. Air Products & Chemicals, Inc.*, 872 A.2d 944, 950 (Dec. 2005).
[60] App. to Opening Br. at 142 (Purchase Agreement § 8.1).
[61] *Id.*
[62] *Textron, Inc. v. Acument Global Technologies, Inc.*, 2011 WL 1326842, at *6 (Del. Sup. Apr. 6, 2011).

Textron asserts that it is not contesting the Superior Court's interpretation of the contract as requiring actual net tax benefits, but it argues that the Superior Court erred in not considering whether Acument had received a tax benefit because of the increase in its basis. As an initial matter, Textron's claim that the Superior Court ignored this issue is incorrect; although the Superior Court could have detailed its findings related to the parties' tax arguments more clearly, the opinion does note that the language of the Purchase Agreement does not support Textron's argument "that the parties intended for an increase in basis to satisfy the Offset," and in fact "belies" that contention.[63]

It is also difficult to distinguish between Textron's argument below that the offset would be triggered by a hypothetical benefit and its argument on appeal that Acument is entitled to an actual benefit, because Textron does not contend that Acument will see any net tax reduction from the stepped-up basis. Instead, Textron seems to want to parse the meaning of "actual" tax benefits. Textron alleges that because U.S. tax law perceives the step-up and step-down in basis as analytically distinct, Acument is entitled to an actual benefit from the step-up that is separate from the (simultaneous and equal) step-down.[64]

But "analyzed separately" does not mean that the decrease in basis is not considered relevant by the IRS. Textron's claim only makes sense if the parties had intended for Textron to partially indemnify Acument for the pre-closing liabilities, contrary to the Superior Court's findings. Given the structure of the sale of the U.S.

---

[63] Opinion at *21.
[64] Opening Br. at 23 ("Any corresponding decrease in tax basis (in step 2) as a result of Textron's indemnity payment is irrelevant, as that decrease is a distinct and independent event under the tax law, the effect of which is analyzed separately.").

19

entities as deemed asset sales and Textron's agreement to indemnify Acument fully, any time Textron pays one of the contingent liabilities, Acument's basis will increase automatically by the amount of the payment – and decrease simultaneously and automatically by the same amount, resulting in no net change. If Acument was required to reimburse Textron for the amount of the increase by itself, every indemnification payment on U.S. liabilities would trigger reimbursement, thus requiring Acument to share responsibility for the pre-closing liabilities. The Superior Court rejected that interpretation of the Purchase Agreement as not supported by the plain terms of the Agreement or the extrinsic evidence, and Textron does not purport to challenge those findings on appeal.[65]

We agree with the Superior Court that the plain language of the Purchase Agreement does not support Textron's interpretation. For example, the relevant provisions in the Purchase Agreement call for Textron to indemnify Acument for "any and all Losses incurred . . . to the extent relating to or arising out of" pre-closing liabilities.[66] The Purchase Agreement does provide for some liabilities to be shared (those related to certain breaches of Textron's representations or warranties), and sets a deductible, minimum and maximum for the shared portion.[67] It was thus reasonable for the Superior Court to assume that the lack of a similar provision related to the other

---

[65] Opinion at *21.
[66] *See* Purchase Agreement § 4.6(h)(ii), § 6.1(b).
[67] *See* Purchase Agreement § 6.1(d)(i).

liabilities suggests that the parties did not intend for those liabilities to be shared.[68]

Further, the tax benefit provision in § 6.1(d)(iii) comes after similar offsets in (i) and (ii), which trigger reimbursement if Acument receives insurance proceeds or third-party contributions, respectively. As the Superior Court determined, "[n]one of the clauses contain language indicating the reduction is 'automatic.' And none of the clauses have language indicating a 'sharing' or partial indemnification. Considering the entire 6.1(d)(iii) clause, it reads as *possible* reductions to the amount of Loss Textron is required to indemnify."[69]

Moreover, because the Superior Court's fact findings were supported by the record, they are entitled to deference on appeal. The Superior Court was persuaded by witness testimony from those involved in drafting and negotiating the Purchase Agreement that the parties intended § 6.1(d)(iii) to prevent a "windfall" to Acument from being both compensated and indemnified for the same underlying liabilities, but the provision was not intended to create a sharing mechanism to relieve Textron of its indemnity obligations.[70]

Although the Superior Court did not highlight it, it is also worth noting that the imbalance generated by requiring Acument to reimburse Textron would be acute because

---

[68] *See, e.g.*, Opinion at *22 ("The Court's finding that the Offset was not meant to be automatic is reinforced by the absence of the words 'hypothetical' or 'automatic' within the [Purchase Agreement]. Again, the parties are well seasoned in mergers and acquisitions – they knew what they were doing. If Textron and [Platinum Equity] agreed to partial indemnification, the indemnification clause could have easily been written to limit Textron's liability either through explicit 'partial indemnification' language or drafting 6.1(d)(iii) to read as 'each Loss is partially indemnified subject to' instead of 'each Loss shall be reduced by[. . . .]'").

[69] Opinion at *21 (internal citations omitted).

[70] Opinion at *22.

Textron – not Acument – receives an actual tax savings from its payment of the contingent liabilities. As Textron's tax expert discussed in his expert report, when the liability is paid, "the seller [*i.e.*, Textron] will be entitled to a tax deduction for satisfaction of its liability to the claimant."[71] But because the indemnification by Textron automatically adjusts the purchase price down, in an amount equal to the increase from the payment of the liability, Acument will not see any change in basis, and thus cannot deduct any amount from its U.S. taxes.[72] If we were to conclude that the parties had silently agreed to share responsibility for pre-closing liabilities, Textron would be doubly-reimbursed (by the IRS and by Acument), while Acument would suffer a net loss.

As well, it is not clear under the Purchase Agreement how Acument could even calculate the amount owed in reimbursement if Textron is correct that the step-up in basis constitutes an actual benefit. Textron highlights the last sentence of the definition of "Tax Benefit" in the Purchase Agreement, but ignores the first. "Tax Benefit" is defined in § 8.1 of the Agreement as: "the *present value of any refund, credit or reduction* in otherwise required Tax payments. . . ."[73] It is not clear what the "present value" of a net zero change in basis is, other than zero.

One potentially confusing factor that the Superior Court did address is that Acument does not contend that the benefit provision is triggered only if there is a reduction in its tax bill in a given year. Rather, because the Purchase Agreement states in (iii) of the Tax Benefit definition quoted above that the "refund, credit or reduction shall

---

[71] App. to Opening Br. at 174 (Gertzman Expert Report at 6).

[72] *See* App. to Opening Br. at 178 (Gertzman Expert Report at 10).

[73] App. to Opening Br. at 142 (Purchase Agreement § 8.1) (emphasis added).

be recognized or received in the earliest possible taxable period (*without regard to any other losses, deductions, refunds, credits, reductions or other Tax items available to such party*)," Acument concedes that "it need not actually save taxes for a Tax Benefit Offset to apply."[74]  But contrary to Textron's argument, and as the Superior Court discussed, the relevant provision refers to timing considerations for calculating the benefit, not whether the offset is triggered in the first instance.[75]  That is, *if* Acument receives a net tax benefit, (iii) of the Tax Benefit definition requires that it calculate the amount owed in reimbursement to Textron based on the "earliest possible taxable period," regardless of whether it could save more if it deferred the payment.  For example, if Acument was able to take advantage of a tax deduction under Brazilian tax law because of Textron's indemnification payments, the fact that Acument could not receive any additional tax savings from doing so because it already had outstanding net operating losses to use in a particular year would not factor into the calculation of which taxable period applied.  By the terms of the Purchase Agreement, the savings to Acument would be deemed to have been caused by the deduction resulting from Textron's indemnification regardless of whether Acument used that deduction.  The Superior Court found that the contract was structured in this way to promote "certainty and clarity" and avoid Textron having to review Acument's tax returns in every jurisdiction in which it was required to file.[76]  The Purchase Agreement's "without regard" language thus does not support Textron's

---

[74] Answering Br. at 31 (emphasis added).
[75] *See, e.g.*, Opinion at *21.
[76] Opinion at *25 n.292.

argument that the offset is triggered despite the decrease in liability from the indemnification.

Because the Superior Court interpreted the language of the Purchase Agreement in a reasonable manner that is supported by substantial extrinsic evidence and commercial logic, its determination that the parties did not intend for Acument's automatic basis increase to constitute a tax benefit within the meaning of the Purchase Agreement must be affirmed.

### B. Textron Has Not Shown That the Superior Court's Use of the Term "Deduction" Was in Error

Textron's second claim on appeal is that the Superior Court erred in narrowing Textron's right to reimbursement from any "reduction" to only a "deduction," "thereby materially altering the contract and the parties' rights thereunder."[77] Textron alleges that because the terms are not interchangeable, "the Superior Court caused real and quantifiable harm to Textron."[78] To wit, Textron argues that construing the tax benefit as a deduction forecloses the possibility that Textron could be entitled to reimbursement when Acument's basis increases in other circumstances or for any other refund, credit, or reduction that is not a deduction in the future.

As noted, the Purchase Agreement entitles Textron to an offset whenever Acument is entitled to a tax benefit, which is defined in the Agreement as "the present value of any *refund, credit or reduction* in otherwise required Tax payments."[79] Contrary to Textron's

---

[77] Opening Br. at 29.
[78] Reply Br. at 16.
[79] App. to Opening Br. at 142 (Purchase Agreement § 8.1) (emphasis added).

argument, the Superior Court did not ignore this language or misconstrue the rights the Agreement provides to the parties. Rather, the Superior Court concluded, "after carefully considering all the documentary evidence, the parties' positions during negotiations, and the parties' conduct after executing the [Purchase Agreement] and Letter Agreement, . . . that the Tax Benefit Offset applies only if Acument is entitled to a 'deduction' upon the making of an indemnification payment."[80] The court added in a footnote that its holding "does not limit or otherwise effect the [Purchase Agreement's] own language regarding a credit and/or refund."[81] The Superior Court then clarified that it "intentionally use[d] the term 'deduction,' as did the parties throughout their negotiations and up to the filing of this lawsuit,"[82] noting that,

> Despite Textron's argument that the [Purchase Agreement] utilizes the broader term of 'reduction,' as will be discussed, the parties tacitly agreed reduction meant deduction as exhibited in their pre-litigation conduct. Because the Court previously ruled the [Purchase Agreement] and Letter Agreement are ambiguous, it is not limited to determining their meaning by a third party standard.[83]

Although this last phrase is somewhat cryptic, it appears from the Superior Court's citations that its use of the word "deduction" is meant to reflect the parties' shared meaning in accordance with standard principles of contractual interpretation: "Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is

---

[80] Opinion at *20.
[81] Opinion at *20 n.248.
[82] Opinion at *20.
[83] Opinion at *20 n.249.

25

interpreted in accordance with that meaning."[84] Because the Superior Court carefully reviewed the extrinsic evidence to interpret the meaning of "tax benefit" in the Purchase Agreement in accordance with the parties' intent, its finding that the parties intended to require a *deduction* related to the indemnification payment to trigger the offset contested in this case is entitled to deference on appeal. The record before the Superior Court was replete with references to "deductions" by both parties,[85] including in "Andrew's Open Issues Summary" drafted by Textron's senior associate general counsel Andrew Spacone, and the later Letter Agreement.[86] Spacone's January 26, 2010, demand letter also asserted that "the fact that Acument . . . may be entitled . . . to a tax *deduction* attributable to the United States claims that are indemnified by Textron . . . is enough to trigger the reduction in Textron's indemnity payments under the Purchase Agreement."[87] In other words, the Superior Court made a well-grounded factual finding that in the context relevant to the dispute before it, the parties understood the term "reduction" to mean a "deduction" in the sense of a net tax benefit.

These findings led to the Superior Court's ultimate holding that the tax benefit offset was not triggered by a hypothetical right to a tax benefit, and that Acument had not actually received a tax benefit under the terms of the Purchase Agreement because it was

---

[84] The Superior Court cited *Wilmington Firefighters Ass'n, Local 1590 v. City of Wilmington*, 2002 WL 418032, at *6, n.33 (Del. Ch. Mar. 12, 2002) (citing RESTATEMENT (SECOND) OF CONTRACTS § 201(1)).

[85] *See* Opinion at *24-26.

[86] Opinion at *13, *19 ("First, the Open Issues Summary declares that the Tax Benefit Offset applies where 'tax liability payments Textron is required to make, [ ] are deductible to Acument.' That is an important concession on Textron's part because it implicates deductibility as the trigger for the Offset.").

[87] App. to Acument Pre-Trial Opening Br. at 129 (letter from Andrew Spacone to John Clark, dated Jan. 26, 2010) (emphasis added).

not entitled to a deduction from its change in basis. But Textron also independently challenges the Superior Court's use of the term "deduction," particularly for claims that are outside the scope of this particular litigation (*i.e.*, tax benefits in the form of tax credits or other non-deduction reductions). As to those claims, though, the Superior Court made it clear that its use of the word "deduction" is not meant to limit other possible reductions in other contexts.[88] In fact, the Superior Court did use the term "reduction" when speaking more broadly about the parties' Agreement: "based upon the parties' conduct and correspondence, a Tax Benefit Offset only applies if Acument is entitled to a Tax deduction *or reduction*."[89]

Because the Superior Court had a reasonable basis to find that the parties themselves understood the relevant tax benefit at issue in this case to be a deduction, there is no merit to Textron's claim that the Superior Court's considered use of the word "deduction" was in error. Accordingly, we affirm the judgment of the Superior Court.

---

[88] Opinion at *20 n. 248.
[89] Opinion at *22 (emphasis added).