# IN THE SUPREME COURT OF THE STATE OF DELAWARE

ENERGY TRANSFER, LP, et al.,   §
  §    No. 391, 2022
  Defendants and Counterclaim   §    Court Below: Court of Chancery
  Plaintiffs Below-Appellants,   §    of the State of Delaware
  §
  v.   §
  §    C.A. Nos. 12168 and 12337
THE WILLIAMS COMPANIES, INC.,   §
  §
  Plaintiff and Counterclaim   §
  Defendant Below-Appellee.   §

Submitted: July 12, 2023
Decided: October 10, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery of the State of Delaware. **AFFIRMED**.

James M. Yoch, Esquire, Alberto E. Chávez, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, Wilmington, Delaware; Paul D. Clement, Esquire (*argued*), Matthew D. Rowen, Esquire, CLEMENT & MURPHY, PLLC, Alexandria, Virginia, *for Appellants Energy Transfer Corp LP, Energy Transfer Equity GP, LLC, Energy Transfer Equity LP, ET Corp GP LLC and LE GP LLC*.

Kenneth J. Nachbar, Esquire, Susan Wood Waesco, Esquire, Matthew R. Clark, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Antony L. Ryan, Esquire (*argued*), Kevin J. Orsini, Esquire, Michael P. Addis, Esquire, CRAVATH, SWAINE & MOORE LLP, New York, New York, *for Appellee The Williams Companies, Inc.*

**GRIFFITHS**, Justice:

This marks the final chapter in a long-running legal saga stemming from a failed, multibillion-dollar merger (the "Merger") of two fuel pipeline giants—The Williams Companies, Inc. ("Williams") and Energy Transfer LP ("ETE"). Although failed mergers are not uncommon, a failed merger without consequence is virtually unheard of. Indeed, these collapses typically generate significant—typically, monetary—consequences. This case is a perfect example.

The parties have spent the better part of a decade litigating over various fees to which they argue they are entitled under the Merger Agreement. ETE continues to assert its entitlement to a $1.48 billion breakup fee, despite being the party who terminated the Merger. It also disputes that it must pay Williams a $410 million reimbursement fee, which it was required to pay if the Merger failed and certain conditions were met. Finally, ETE argues that a related $85 million attorney's fee award is unreasonable.

But we find no error with the Court of Chancery's well-reasoned opinions that hold that ETE is not entitled to an over-one-billion-dollar fee and find that ETE must pay Williams the $410 million reimbursement fee and the related $85 million in attorney's fees. The litigation between the parties over their failed merger has now come to an end.

We affirm.

2

## I.    Background[1]

### A. *The Parties*[2]

Appellant Energy Transfer LP, formerly known as Energy Transfer Equity, L.P.,[3] is a Delaware limited partnership with its principal executive offices located in Dallas, Texas. ETE's family of companies owns and operates approximately 71,000 miles of natural gas, natural gas liquids, refined products, and crude oil pipelines. ETE is run by its Chairman and Chief Executive Officer Kelcy Warren ("Warren"). Jamie Welch ("Welch") served as its Chief Financial Officer during the relevant period.

Appellant Energy Transfer Corp LP ("ETC") is a Delaware limited partnership taxable as a corporation. Pursuant to the Merger, Williams would have merged with and into ETC. ETC is a party to the Agreement and Plan of Merger entered on September 28, 2015 (the "Merger Agreement") and would have been the managing member of the general partner of ETE following the consummation of the Merger.

---

[1] Unless otherwise noted, the facts are taken from the Court of Chancery's 2021 post-trial opinion. *See Williams Companies, Inc. v. Energy Transfer LP*, 2021 WL 6136723 (Del. Ch. Dec. 29, 2021), *judgment entered sub nom. The Williams Companies, Inc. v. Energy Transfer LP* (Del. Ch. 2022) (hereinafter, "Chancery Post-Trial Opinion").

[2] Unless otherwise specified, we refer to Appellants collectively as "ETE."

[3] On October 19, 2018, Energy Transfer, L.P. changed its name to "Energy Transfer LP." The parties agree that Energy Transfer Equity, L.P. is the same entity as Energy Transfer LP for the purposes of this litigation.

3

Appellant ETE Corp GP, LLC is a Delaware limited liability company, the general partner of ETC, and a party to the Merger Agreement.

Appellant LE GP, LLC is a Delaware limited liability company, the general partner of ETE, and a party to the Merger Agreement.

Appellant Energy Transfer Equity GP, LLC is a Delaware limited liability company and a party to the Merger Agreement. Pursuant to the Merger, ETE GP would have merged with LE GP such that ETE GP would have been the surviving company and general partner of ETE.

Appellee Williams is a publicly traded Delaware corporation with its principal executive offices located in Tulsa, Oklahoma. The company specializes in energy-infrastructure projects, and it owns and operates interstate gas pipelines, as well as gathering and processing operations throughout the country. It is managed by its Chief Executive Officer, Alan Armstrong ("Armstrong"), and its Chief Financial Officer, Don Chappel ("Chappel"). Williams is a party to the Merger Agreement.

B. *Factual Background*

1. <u>Williams Agrees to the WPZ Transaction</u>

In May 2015, Williams agreed to acquire the publicly held units in its master limited partnership, Williams Partners, L.P. ("WPZ"). The agreement required Williams to pay WPZ a termination fee of $410 million if it later terminated the WPZ

4

transaction (the "WPZ Termination Fee"). When ETE made an offer to acquire Williams, ETE required Williams to terminate the WPZ transaction.

### 2. The Merger Agreement Negotiations

In May 2015, ETE submitted a bid to purchase Williams in an all-equity deal and merger negotiations ensued over the summer of 2015. The parties elected to structure the merger as an "Up-C" transaction: in exchange for their shares, Williams' shareholders would not receive ETE common units; instead, they would receive stock in a newly formed entity called Energy Transfer Corp LP. Following the transaction, ETC would own Class E Units representing roughly 57% of the limited partner interest of ETE, leaving the existing limited partners of ETE with the remaining 43% interest. The former Williams shareholders, in turn, would own approximately 81% of ETC's shares and would receive $6.05 billion in cash consideration. ETE, for its part, would own all of Williams' assets and the other 19% of ETC's shares.

Given the unique equity component of the deal, "achieving economic equivalence" was paramount to Williams' board of directors (the "Williams Board").[4] One cause for concern stemmed from the fact that Warren personally owned a significant number of ETE units—generating roughly $200 million in annual personal cash flow from the company's quarterly distributions—and would

---

[4] *Chancery Post-Trial Opinion* at *3; *see also* App. to Opening Br. at A3241–42.

control the combined entity post-merger. As such, he had both a reason and the ability to take actions benefitting ETE at the expense of ETC. For example, if ETC shares traded at a discount to ETE units due to disproportionate distributions of ETE units, this would negatively affect the value of the merger consideration Williams' shareholders had received.

Several features of the deal reflected Williams' concerns. The $6.05 billion cash payment, used by ETE to purchase shares in ETC, was designed as a "hook stock" to align ETE's and ETC's financial interests. ETE also committed to paying dividends on ETC shares equal to the distributions paid on ETE common units through 2018 and to providing ETC shareholders with a one-time equalizing payment at the end of two years if ETC shares were trading at a discount to ETE common stock. Further, the Merger Agreement required that ETE maintain its existing capital structure—composed of three classes of equity—through closing.

### 3. The Merger Agreement

Williams and ETE executed the Merger Agreement on September 28, 2015 and agreed to a closing date of June 28, 2016 (the "Closing Date"). The Agreement contained several provisions that are at issue on appeal, including the Company Board Recommendation, the Company Board Recommendation Change, the parties' Efforts Obligations, and the Attorney's Fee provision, all of which are defined and described below.

a. The Company Board Recommendation and the Company Board Recommendation Change Provisions

Under the Agreement, the Williams Board was required to pass a series of resolutions in support of the transaction (the "Company Board Recommendation").[5] If the Williams Board adversely changed its recommendation in favor of the merger (the "Company Adverse Recommendation Change"),[6] then Williams would be required to pay a $1.48 billion breakup fee (the "$1.48 billion Termination Fee") to ETE if it chose to terminate the Merger on that ground.[7] Under the Company Adverse Recommendation Change provision, "[n]either the Board of Directors of [] [Williams] nor any committee thereof shall (i)(A) withdraw (or modify or qualify in a manner adverse to [ETE]), or publicly propose to withdraw (or modify or qualify in a manner adverse to [ETE]), the Company Board Recommendation[.]"[8]

b. The Parties' Efforts Obligations and the Interim Operating Covenants

The parties also agreed to several covenants in the Merger Agreement regarding their conduct between signing and closing, all of which are subject to exceptions.[9] First, they agreed to operate in the ordinary course of business in the

---

[5] *See* App. to Opening Br. at A434 (Merger Agreement § 3.01(d)).
[6] *Id.* at A464 (Merger Agreement § 4.02(d)).
[7] *See id.* at A480 (Merger Agreement § 7.01(e)); *see also id.* at A474 (Merger Agreement § 5.06(d)(iii)).
[8] *Id.* at A464 (Merger Agreement § 4.02(d)).
[9] These exceptions are identified in Section 4.01 of the Parent Disclosure Letter. *See infra* at § I.B.4.

7

period between signing and closing (the "Ordinary Course Covenant").[10] Second, the Agreement obligated the parties to use their reasonable best efforts to close the transaction (the "Best Efforts" provision, and collectively with the Ordinary Course Covenant, the "Efforts Obligations.").[11]

In addition to the general Ordinary Course Covenant, ETE made specific course-of-business covenants, which included agreements not to place distribution restrictions on its units, not to amend its organizational documents, and to limit its equity issuances (the "Interim Operating Covenants").[12] These were subject to an "all material respects" qualifier by the time of Closing.[13] For its part, Williams agreed to cooperate with any reasonable request in furtherance of ETE's financing of the transactions (the "Capital Structure Representation").[14]

Section 6.03(b) of the Merger Agreement required that ETE certify, as of closing, its material compliance with the provisions included in the Ordinary Course and Interim Operating Covenants.[15] Were ETE to terminate the transaction while in violation of its covenants, Section 5.06(f) of the Merger Agreement required that it

---

[10] *See* App. to Opening Br. at A460–62 (Merger Agreement § 4.01(b)).
[11] *See id.* at A468–70 (Merger Agreement § 5.03).
[12] *See id.* at A460–62 (Merger Agreement § 4.01(b)).
[13] *See id.* at A478 (Merger Agreement § 6.03(b)) ("[ETE] shall have, in all material respects, performed or complied with all obligations required by the time of the Closing to be performed or complied with by it under this Agreement . . . .").
[14] *See id.* at A476 (Merger Agreement § 5.14) ("[Williams] shall . . . provide cooperation reasonably requested by [ETE] that is necessary or reasonably required in connection with the Financing . . . .").
[15] *Id.* at A478 (Merger Agreement § 6.03(b)).

reimburse Williams its $410 million payment to WPZ (the "WPZ Termination Fee Reimbursement").[16]

### c. Attorney's Fees Provision

Section 5.06(g) of the Merger Agreement provided that Williams was entitled to "reasonable attorney['s] fees and expenses" if it was the prevailing party in an action to recoup the WPZ Termination Fee Reimbursement.[17]

### 4. The Parent Disclosure Letter & The $1 Billion Equity Issuance Exception Negotiation

Separate from, but incorporated into, the Merger Agreement were disclosure letters the parties provided to one another that contained carveouts and exceptions to the terms of the Merger Agreement. In ETE's Parent Disclosure Letter (the "Parent Disclosure Letter" or "PDL"), the exceptions are organized under headers that correspond to specific sections within Section 4.01 of the Agreement. For example, ETE's Ordinary Course Covenant and Interim Operating Covenants, which are in Section 4.01(b) of the Merger Agreement, are subject to exceptions in Section 4.01(b) of the Parent Disclosure Letter.[18] The PDL states that "[t]he headings contained in this Parent Disclosure Letter are for reference only and shall not affect in any way the meaning or interpretation of the Parent Disclosure Letter."[19]

---

[16] *Id.* at A474 (Merger Agreement § 5.06(f)).
[17] *Id.* (Merger Agreement § 5.06(g)).
[18] *Id.* at A460 (Merger Agreement § 4.01(b)).
[19] *Chancery Post-Trial Opinion* at *6.

The exception at issue on appeal appears in Section 4.01(b)(v) of the PDL.[20] Section 4.01(b)(v) of the Merger Agreement restricts ETE's ability to issue equity securities,[21] but Section 4.01(b)(v) of the PDL (the "$1 Billion Equity Issuance Exception") states that "[ETE] may make issuances of equity securities with a value of up to $1.0 billion in the aggregate."[22]

The $1 Billion Equity Issuance Exception was initially embedded within Section 4.01(b)(v) of the Merger Agreement itself.[23]  But on September 27, 2015, the day before signing, the parties moved that exception and several others from the Merger Agreement into their respective disclosure letters.[24]  In ETE's case, it removed the $1 Billion Equity Issuance Exception from Section 4.01(b)(v) of the Merger Agreement and placed it under a header in Section 4.01(b) of the PDL titled "Section 4.01(b)(v)."

The Court of Chancery later noted that "[t]he evidence presented at trial established that the parties moved the exceptions into the disclosure letters to maintain their confidentiality, and that they did not intend the moves to be

---

[20] *See id.* at A413 (Parent Disclosure Letter § 4.01(b)).
[21] *See id.* at A460 (Merger Agreement § 4.01(b)(v)).
[22] *Id.* at A413 (Parent Disclosure Letter § 4.01(b)(v)).
[23] *See* App. to Answering Br. at B459–50 (Merger Agreement August 2015 Draft).
[24] *See* App. to Opening Br. at A3308 (Van Ngo Tr.) ("[C]ertain of the exceptions to the interim operating covenants that the parties had negotiated have been removed from the body of the merger agreement and have been moved into the disclosure schedule.").

substantive."[25]   Williams' counsel, Cravath, Swaine & Moore LLP ("Cravath"), communicated to Wachtell, Lipton, Rosen & Katz ("Wachtell"), ETE's counsel, that they "were fine with this movement, with the understanding that it was nonsubstantive," meaning that each exception would apply to the section from which it had been moved using corresponding headers.[26]   One of Williams' attorneys also testified that he communicated to ETE's counsel his understanding that the disclosure letters were "section-specific."[27]

### 5.  The Williams Board Approves the Merger

On September 25, 2015, the Williams Board voted to approve the Merger by a vote of 8-5.[28]   Three days later, the Williams Board approved and declared the Merger advisable.  Williams subsequently terminated the WPZ agreement and paid the WPZ Termination Fee.  Under the Merger Agreement, if the Merger failed and certain conditions were met, ETE was required to reimburse Williams for the $410 million termination fee (the "WPZ Termination Fee Reimbursement").

---

[25] *Chancery Post-Trial Opinion* at *7; *see, e.g.*, App. to Opening Br. at A3121 (Chappel Tr.) (explaining that there would be "[n]o change in rights" based on moving provisions to the disclosure letters); *id.* at A3310 (Van Ngo Tr.) ("My experience with how disclosure schedules work as an M&A lawyer is that they are section-specific.").

[26] *Chancery Post-Trial Opinion* at *7.

[27] App. to Opening Br. at A3310 (Van Ngo Tr.) ("During the first call we had regarding the representations and covenants, I noted to [ETE's counsel] that . . . the disclosure letter is section-specific and that I preferred the 'reasonably apparent on its face' formulation for the savings clause. And her response was, 'That's fine.'").

[28] The day before, the Williams Board conducted a straw poll and preliminary rejected the Merger by a 6-7 vote. *See Chancery Post-Trial Opinion* at *9.  Two directors—Janice Stoney ("Stoney") and Joe Cleveland ("Cleveland")—ended up changing their votes. *Id.*

### 6. The Energy Market Craters & the Parties Have Reservations

By the end of 2015, commodity prices dropped precipitously, and the energy market deteriorated as a result. This led both ETE and Williams to take stock of the value of the Merger.

ETE, for its part, grew concerned that its plan to finance the $6.05 billion cash component of the deal would harm its credit ratings. Even the possibility of cutting distributions, a drastic step, appeared to be on the table.[29] By early 2016, ETE's CEO Kelcy Warren had begun looking for ways to restructure or "walk away" from the transaction and expressed this to Williams.[30] He approached Williams with ideas for restructuring or abandoning the deal, which included cutting ETE's historical distribution or waiving Williams' walkaway fee were it to agree to terminate the Merger.[31]

Williams had concerns as well. Armstrong, Williams' CEO, and dissenting Williams directors communicated their concerns about the merits of the Merger in internal emails and copied Stoney and Cleveland, the two directors who initially

---

[29] *Id.* at A3492 (Welch Tr.) ("[T]he value of an ETE unit or an ETC share was, in large part, driven by people's perception of, in fact, . . . the viability of that enterprise to continue to pay a distribution . . . .").

[30] *Id.* at A3518 (Welch Tr.); *see also id.* at A3391 (Warren Tr.) ("I felt very strongly that this was the wrong time to be incurring debt. . . . [I]f there's any way that we could equitize or better equitize this transaction by using currency rather than cash, that would be a smart thing to do."); *id.* at A3392 (noting discussions with Williams personnel to restructure the transaction).

[31] *Id.*

opposed the merger but later voted to approve it.[32]  This did not appear to be a campaign to turn the board against the deal, however, as Stoney later testified that she never felt pressured to change her position.[33]

Although the Williams Board entertained some internal dissent about the deal, on January 15, 2016, it determined that the Merger Agreement was a "valuable asset" and issued a press release expressing its unanimous support for the deal.  Williams' financial advisors, Lazard and Barclays, concluded, moreover, that, even after the financial downturn in the energy markets, the merger still represented a boon to Williams' shareholders.  The Williams Board repeatedly recommended, throughout the period leading to the June 28 closing date, that its stockholders approve the deal, which they did on June 27, 2016, by a large margin.

### 7. ETE's Proposed Public and Preferred Offerings

ETE, fearing a liquidity crunch, began exploring solutions to its potential leverage issues.  On January 27, 2016, ETE's financial advisors proposed the idea of issuing a new class of preferred stock on the public market (the "Proposed Public Offering").  ETE had floated the possibility of cutting distributions, and the Proposed Public Offering provided a solution that could limit the potential negative impacts of doing so.  The final form of the Proposed Public Offering included an 11-cent

---

[32] *See, e.g., id.* at A915–17 (internal Williams' email discussing concerns over ETE transaction).
[33] *See id.* at A3960 (Stoney Tr.).

cash distribution and an additional 17½ cents of accrual credits for when the preferred units converted to common units. The result was a solution that no longer served the purpose of conserving cash but rather "represent[ed] a wealth transfer from non-participating units to participating units."[34]

To proceed with the Proposed Public Offering, ETE needed Williams' consent, but Williams refused. If ETE cut distributions, no payments would flow to former Williams' shareholders, and they also would suffer dilutive effects from the eventual conversion of the preferred ETE units. If ETE did not cut distributions, ETC shareholders would still be disadvantaged by the distribution preference to holders of the preferred ETE units. Williams' financial advisors "advised the Williams [B]oard that this would have an extraordinary detrimental impact on Williams' shareholders."[35] Williams offered to compromise if its shareholders were allowed to participate, but ETE declined.

At the end of February 2016, ETE restructured the issuance as a private offering, creating a new class of equity—Series A Convertible Preferred Units with a higher distribution preference of 28½ cents—which it made available to ETE insiders, including Warren (the "Preferred Offering"). The Preferred Offering operated similarly to the Proposed Public Offering, but as a private placement it did

---

[34] App. to Answering Br. at B2698.
[35] App. to Opening Br. at A3149 (Chappel Tr.).

14

not require consent from Williams' auditors.[36] Indeed, it was exclusive to ETE insiders, with Warren and a small group received over 85% of the units, and was estimated to be valued at just under $1 billion. Because the new stock featured an increased distribution preference, one market analyst wrote that "it looks to me (and the market, apparently) that [Warren] has insulated himself from a distribution cut, but ETE common holders are still on the hook for a potential distribution cut should one be required."[37]

ETE closed the Preferred Offering on March 8, 2016 without notifying Williams. Unsurprisingly, the Williams Board and management were displeased with the Preferred Offering when they learned of it. The Court of Chancery ultimately found, in an action brought by ETE unitholders, that the Preferred Offering was "a hedge meant to protect [ETE] insiders from the anticipated bad effects of the coming merger" and that it breached the company's partnership agreement.[38]

---

[36] *See In re Energy Transfer Equity, L.P. Unitholder Litig.*, 2018 WL 2254706, at *8 (Del. Ch. May 17, 2018), *aff'd sub nom. Levine v. Energy Transfer L.P.*, 223 A.3d 97 (Del. 2019) (hereinafter, "Unitholder Litig.") ("Williams Co.'s refusal to obtain the necessary consents meant that ETE could not consummate the public offering. Thus, on February 22, 2016, the Board decided to change course and pursue the Private Offering of securities. Notably, a private placement would not require Williams Co.'s consent.").

[37] *Chancery Post-Trial Opinion* at *15.

[38] *Id.* at *26 (quoting *Unitholder Litig.* at *1).

15

On April 6, 2016, Williams filed separate suits in the Court of Chancery[39] and Texas state court to challenge the Preferred Offering.[40] The Texas lawsuit was against Warren personally and alleged tortious interference with the Merger Agreement.[41] It was dismissed in May 2016 based on a forum selection clause in the Merger Agreement.[42] The Preferred Offering also became the subject of a separate unitholder action and the Court of Chancery found that it constituted a breach of the ETE limited partnership agreement.[43]

ETE followed the Preferred Offering with an announcement on April 18, 2016 that it would cut common unit distributions for two years. The next day, Williams amended its complaint in the Court of Chancery to reflect the ETE announcement.

8. Williams Grapples with Shareholder Litigation

In the meantime, Williams was faced with a raft of shareholder lawsuits challenging the Merger. Williams was able to obtain either a dismissal or settlement in each suit and successfully prevented any of the lawsuits from blocking the Merger.

One of these lawsuits was brought by John Bumgarner ("Bumgarner"), a shareholder and former executive of Williams.[44] Bumgarner initially took issue with certain synergy estimates provided in support of the Merger. Armstrong, as a friend

---

[39] *See* App. to Answering Br. at B2743.
[40] *See Williams Companies, Inc. v. Warren*, No. DC-16-03941 (Dist. Ct. Dallas Cty.).
[41] *See id.*
[42] *See* App. to Opening Br. at A1175 (*Williams v. Warren* Dismissal Order).
[43] *Unitholder Litig.* at *2.
[44] *See Bumgarner v. Williams Companies, Inc.*, 2016 WL 1717206 (N.D. Okla. Apr. 28, 2016).

and former colleague of Bumgarner, hoped to resolve the matter by engaging personally with Bumgarner to allay his concerns. To prevent unintended escalation and contain the matter in a way that he could continue leveraging his personal relationship, Armstrong did not broadly disclose his communications with Bumgarner, though he did inform the Chairman of the Williams Board, Frank MacInnis.[45] The Court of Chancery found that "the evidence presented at trial demonstrated that, although Armstrong did regularly communicate with Bumgarner, he did so in an attempt to allay Bumgarner's opposition to the Merger, not in connection with a clandestine plot to thwart it."[46]

Armstrong and Bumgarner communicated frequently through personal email accounts beginning in November 2015. They continued communicating even after Bumgarner filed a securities class action against Williams on January 14, 2016 and until shortly after the lawsuit was resolved in June 2016. In 2016, two days after his deposition, during which Armstrong was asked if he communicated with Bumgarner, he deleted one of the emails accounts he used to communicate with

---

[45] *See* App. to Opening Br. at A3716–18 (Armstrong Tr.) (Armstrong explaining that he did not tell Williams' counsel that Bumgarner was threatening a lawsuit because he "had a long relationship with John" and "did not think it would be in the company's best interest to immediately get lawyered up" as this could lead to "a very aggressive fight").

[46] *Chancery Post-Trial Opinion* at *18.

him.[47]  The Court of Chancery found that his actions constituted spoliation of evidence and awarded ETE monetary sanctions for his conduct.[48]

### 9. Williams Encourages Shareholders to Approve the Merger

Throughout the market downturn and internal debate over the merits of the transaction, Williams remained committed to closing the transaction and obtaining shareholder approval of the Merger.  On November 24, 2015, the Williams Board recommended that its shareholders vote for the deal.[49]  Then, in January and February 2016, it stated repeatedly that it was "unanimously committed" to closing.[50]  Directors who had voted against the deal internally expressed some discomfort with that wording, and Williams later acknowledged that there had been some disagreement among the board regarding the merger in an updated S-4 filing.[51]

---

[47] *Chancery Post-Trial Opinion* at *18.

[48] *Id.* at *36.

[49] *See* App. to Opening Br. A566 (Form S-4 Registration Statement) ("After careful consideration, the W[illiams] Board has (i) approved the merger agreement, (ii) declared the merger agreement and the transactions contemplated thereby, including the merger, to be advisable and in the best interests of [Williams] and its stockholders, (iii) directed that the adoption of the merger agreement be submitted to a vote at a meeting of [Williams'] stockholders and (iv) resolved to recommend that [Williams'] stockholders approve the adoption of the merger agreement and the transactions contemplated thereby, including the merger and the Compensatory Proposal.").

[50] App. to Opening Br. at A768 (Williams January 15, 2016 Press Release); App. to Answering Br. at B2714 (Williams February 17, 2016 Press Release).

[51] *See* App. to Opening Br. at A840 ("My concern with saying unanimous is that it represents more trickery."); *id.* at A1174 (May 26, 2016 Amendment No. 8 to Form S-4) ("As of the date of this proxy statement/prospectus, a majority of the [Williams] Board continue to recommend a vote 'FOR' the Merger Proposal.  Certain members of the [Williams] Board voted on September 28, 2015 against entering into the merger agreement and continue as of the date of this proxy statement/prospectus to disagree with the recommendation of a majority of the [Williams] Board that [Williams'] stockholders adopt the merger agreement.").

The messaging, however, remained consistent, with the Williams Board continuing to reaffirm its support for the transaction throughout the spring of 2016 in press releases and during a week-long investor roadshow.[52]   In addition, Williams sued ETE in April and May 2016 seeking specific performance of the Merger Agreement.

Williams' efforts culminated in a shareholder vote on June 27, 2016, the day before the Closing Date.  Over 80% of shareholder votes cast were in favor of the Merger.

### 10.  Latham Fails to Render the 721 Tax Opinion

Williams may have been "ready, willing, and able to close" by the Closing Date, but this ultimately did not matter.[53]  In March 2016, ETE personnel flagged a potential issue with the tax treatment of the transaction under Section 721(a) of the Internal Revenue Code and forwarded the matter to Latham & Watkins.[54]  Latham conducted a thorough investigation of the matter and "devoted over 1,000 hours" to the issue.[55]

---

[52] *See, e.g.*, *id.* at A1659 (Williams April 6, 2016 Press Release) ("The Williams Board is unanimously committed to enforcing its rights under the merger agreement entered into with ETE on September 28, 2015 and to delivering the benefits of the merger agreement to Williams' stockholders. ETE has no basis to avoid its obligations under the merger agreement."); *see also* A1174 (May 24, 2016 Amendment No. 8 to Form S-4).

[53] *Id.* at B8148.

[54] As a condition precedent to the Merger, Latham was required to opine that the Merger "should" trigger favorable tax treatment under Section 721(a) of the Internal Revenue Code (the "721 Opinion").

[55] *Chancery Post-Trial Opinion* at *21.

On April 12, 2016, Latham reached a "tentative conclusion" that it could not provide an opinion stating the transaction "should qualify" under Section 721(a).[56] Back and forth discussions ensued with Williams' attorneys at Cravath, who disagreed with Latham's analysis, but a feasible workaround remained elusive.[57] Shortly after, on April 18, 2016, the parties announced Latham's position that it would not be able to provide the 721 Opinion.

### 11. ETE Terminates the Merger

Williams and ETE were already locked in litigation over the Preferred Offering when Latham announced it could not issue the 721 Opinion. On May 13, 2016, Williams filed another lawsuit to enjoin ETE from terminating the merger based on Latham's inability to provide the 721 Opinion. The Court of Chancery consolidated the actions and held a two-day expedited trial starting June 20, 2016. On June 24, 2016, the court ruled that the 721 Opinion was a condition precedent to the merger and its failure excused ETE's performance.[58]

Following the Court of Chancery's decision, ETE's counsel notified Williams that it would not close due to failure of the 721 Opinion condition. On June 29, 2016

---

[56] App. to Opening Br. at A4472 (Stein Tr.).

[57] *See Williams Companies, Inc. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *15–16 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017) (hereinafter, "Chancery Merger Termination Opinion").

[58] *See Chancery Merger Termination Opinion* at *2 ("Because . . . Latham, as of the time of trial, could not in good faith opine that tax authorities should treat the specific exchange in question as tax free under Section 721(a) . . . I find that the Partnership is contractually entitled to terminate the Merger Agreement . . . .").

ETE terminated the Merger. This Court subsequently considered the case on appeal and upheld the Court of Chancery's ruling in March 2017.[59] Although we were also critical of ETE's conduct and noted "there was evidence . . . from which [the Court of Chancery] could have concluded that ETE did breach its covenants," we affirmed the Court of Chancery's finding that Latham nevertheless operated in good faith and independent of ETE when it decided not to issue the 721 Opinion.[60]

C. *Procedural History*

The termination of the Merger Agreement was just the beginning of legal battles over damages stemming from the failed transaction, the most significant involving claims to contractual termination fees. Williams sought payment of the $410 million WPZ Termination Fee Reimbursement. Section 5.06(f) of the Merger Agreement, which covered the WPZ Termination Fee Reimbursement, triggered payment of the fee if ETE terminated the agreement due to passage of the outside date and, at the time of termination, was in breach of any enumerated provisions, including the Capital Structure Representation, the Ordinary Course Covenant, the Interim Operating Covenants, and efforts obligations.[61] According to Williams, ETE was in breach of these provisions when it terminated. Specifically, Williams argued that the Preferred Offering had resulted in inaccuracies in ETE's representation that

---

[59] *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 267 (Del. 2017).
[60] *Id.* at 273.
[61] *See* App. to Opening Br. at A474 (Merger Agreement § 5.06(f)).

21

its capital structure was composed of three equity classes as well as breaches of its Ordinary Course Covenant and Interim Operating Covenants. Williams also continued to make arguments related to the 721 Opinion and alleged that ETE breached its best efforts and tax representation obligations.

ETE, despite having refused to close, filed a counterclaim seeking payment of the $1.48 billion Termination Fee alleging that Williams had caused a Company Adverse Recommendation Change that undermined the Merger.[62] Williams moved to dismiss ETE's counterclaims. At this stage, Williams and Cravath also modified their fee arrangement. The two previously worked with an hourly fee arrangement but shifted to a 15% contingent-fee arrangement in September 2017.[63] In a December 2017 opinion, the Court of Chancery rejected the counterclaim.[64]

Cross-motions for summary judgment on ETE's liability for the WPZ Termination Fee Reimbursement followed.[65] ETE argued that (1) the failure of the 721 Opinion condition was not among the triggers for the WPZ Termination Fee Reimbursement; (2) the failure of the condition precedent excused it from further obligations under the Merger Agreement, including the payment of the WPZ

---

[62] *See Williams Companies, Inc. v. Energy Transfer Equity*, 2017 WL 5953513, at *2 (Del. Ch. Dec. 1, 2017) (hereinafter, "Chancery Motion to Dismiss Opinion").

[63] *See Williams Companies, Inc. v. Energy Transfer LP*, 2022 WL 3650176, at *2 (Del. Ch. Aug. 25, 2022) (hereinafter, "Chancery Fee Opinion").

[64] *See Chancery Motion to Dismiss Opinion* at *8.

[65] *See Williams Companies, Inc. v. Energy Transfer LP*, 2020 WL 3581095, at *1 (Del. Ch. July 2, 2020) (hereinafter, "Chancery Summary Judgment Opinion").

Termination Fee; and (3) its breaches, if any, were concededly immaterial as Williams was willing to waive them in order to close the transaction. ETE further sought summary judgment as to whether it had breached its efforts obligations. Both parties moved for summary judgment focused on whether ETE had breached its tax representation obligations, ordinary course covenants, and capital structure representation.

In its 2020 opinion, the Court of Chancery determined that most of the issues the parties raised were best resolved at trial and limited its ruling to matters of contractual interpretation. Approaching trial, the primary unresolved issue was whether ETE, subject to materiality qualifiers, had breached any of the conditions enumerated in Section 5.06(f) that would trigger liability for the WPZ Termination Fee Reimbursement and if ETE had any legitimate defenses.[66] After trial, the court found ETE had "failed to comply 'in all material respects'" with the Ordinary Course Covenant and three Interim Operating Covenants through the Preferred Offering.[67] ETE's breach of the Ordinary Course Covenant occurred through breach of its own LLC Agreement, as established in the separate securities litigation case stemming

---

[66] *See id.* at *21 ("[ETE] also asserts affirmative defenses based on several issues in those counterclaims, including that Williams failed to substantially comply with the Merger Agreement, that Williams has unclean hands, and that even if ETE's Preferred Offering violated the Merger Agreement, it was Williams' wrongful refusal to consent to the Public Offering that caused that breach.")

[67] *Chancery Post-Trial Opinion* at *28.

from the Preferred Offering.[68] The breaches of the Ordinary Course Covenant, the Interim Operating Covenants, and the Capital Structure Representation were sufficient for the court to find that the WPZ Termination Fee Reimbursement was triggered.[69] The Court of Chancery considered and rejected ETE's arguments concerning Williams' alleged breaches of the Merger Agreement.

The Court of Chancery awarded fees to Williams in line with the fee-shifting provision for WPZ Termination Fee Reimbursement in Section 5.06(g).[70] Williams and Cravath had restructured their fee agreement into a 15% contingent fee arrangement, resulting in the payment of Cravath's contingency fee by ETE. This was a $74,846,161.32 fee over and above the WPZ Termination Fee Reimbursement.[71] ETE opposed Williams' attempt to shift payment of the contingency fee. In its opinion addressing the fee award, the Court of Chancery found in favor of Williams.

ETE has appealed the Court of Chancery's 2017 dismissal of ETE's breach-of-contract counterclaim; portions of the Court of Chancery's 2021 post-trial opinion awarding Williams the $410 million WPZ Termination Fee Reimbursement; and the

---

[68] *Unitholder Litig.* at *25 ("The securities, to the extent they were transferred to the General Partner or its affiliates, breached the LPA, and I find that the Defendant Directors caused the General Partner to breach the LPA by issuing these securities.").

[69] *See Chancery Post-Trial Opinion* at *25.

[70] *See id.* at *36 ("For the foregoing reasons, judgment is entered in favor of the Plaintiff in the amount of $410 million, plus interest at the contractual rate, and its reasonable attorney['s] fees and expenses.").

[71] *See Chancery Fee Opinion* at *2.

Court of Chancery's 2022 finding that Williams' attorney's fee award was reasonable under the Merger Agreement's fee-shifting provision.

## II.    **Analysis**

This appeal presents four issues:  first, whether the Court of Chancery erred by dismissing ETE's counterclaim for the $1.48 billion Termination Fee; second, whether the Court of Chancery erred in finding that Williams did not materially breach the Merger Agreement; third, whether the Court of Chancery erred in finding that the Preferred Offering breached the Merger Agreement and was not excused by the $1 Billion Equity Issuance Exception; and fourth, whether the Court of Chancery abused its discretion by awarding Williams attorney's fees and expenses pursuant to a contingent fee agreement.  As described below, we find all of ETE's arguments on appeal to be without merit.

> A. *Williams Did Not Adversely Modify the Company Board Recommendation and ETE Cannot Recover the $1.48 Billion Termination Fee*

ETE first argues that the Court of Chancery erred in dismissing its counterclaim seeking the $1.48 billion Termination Fee.  ETE's counterclaim alleged that Williams breached the Merger Agreement by making public statements—"in press releases, lawsuit pleadings, the Form S-4, and other sources"[72]—which

---

[72] App. to Opening Br. at A1568 (ETE's Second Am. & Supplemental Affirm. Defenses & Verified Countercl. (the "Countercl.") ¶ 54); *see also id.* at A1570–89 (Countercl. ¶¶ 60-96).

25

constituted a Company Adverse Recommendation Change, thus entitling ETE to the fee. We review the Court of Chancery's dismissal of a claim under Rule 12(b)(6) *de novo*.[73] Dismissal of a claim based on contract interpretation is proper "if the defendants' interpretation is the *only* reasonable construction as a matter of law."[74]

This issue turns on the interpretation of Sections 3.01(d) and 4.02(d) of the Merger Agreement. Under Section 3.01(d), the Williams Board was required to adopt four resolutions in furtherance of the Merger (the "Company Board Recommendation"):

> *The Board of Directors of the Company duly and validly adopted resolutions* (A) approving and declaring advisable this Agreement, the Merger and the other Transactions, (B) declaring that it is in the *best interests of the stockholders* of the Company that the Company enter into this Agreement and consummate the Merger and the other Transactions on the terms and subject to the conditions set forth herein, (C) directing that the adoption of this Agreement be submitted to a vote at a meeting of the stockholders of the Company and (D) recommending that the stockholders of the Company adopt this Agreement ((A), (B), (C) and (D) being referred to herein as the "Company Board Recommendation"), *which resolutions*, as of the date of this Agreement, have not been rescinded, modified or withdrawn in any way.[75]

---

[73] *In re General Motors S'holder Litig.,* 897 A.2d 162, 167–68 (Del. 2006).

[74] *Vanderbilt Income & Growth Assocs., LLC v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (internal citations omitted) (emphasis in original); *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (emphasis in original).

[75] App. to Opening Br. at A434 (Merger Agreement § 3.01(d)) (emphases added).

Section 4.02(d) describes the actions that could constitute a withdrawal, modification, or qualification of the Company Board Recommendation (a "Company Adverse Recommendation Change"):

> (d) Neither the *Board of Directors of the Company nor any committee thereof* shall (i)(A) *withdraw (or modify or qualify in a manner adverse to [ETE])*, or *publicly propose* to withdraw (or modify or qualify in a manner adverse to [ETE]), the Company Board Recommendation or (B) recommend the approval or adoption of, or approve or adopt, declare advisable or publicly propose to recommend, approve, adopt or declare advisable, any Company Takeover Proposal (any action described in this clause (i) being referred to as a "Company Adverse Recommendation Change") or (ii) approve or recommend, or publicly propose to approve or recommend, or cause or permit the Company or any of its Subsidiaries to execute or enter into any Company Acquisition Agreement.[76]

Section 4.02(f) contains a safe harbor provision that permitted Williams to make certain disclosures:

> (f) Nothing contained in this Section 4.02 or elsewhere in this Agreement shall prohibit the Company or any of its Subsidiaries from (i) taking and disclosing to its stockholders a position contemplated by Rule 14d-9, Rule 14e-2(a) or Item 1012(a) of Regulation M-A promulgated under the Exchange Act or (ii) making any disclosure to its stockholders if the Board of Directors of the Company or any of its Subsidiaries determines in good faith (after consultation with and receiving advice of its outside legal counsel) that the failure to do so would reasonably be likely to constitute a breach of its fiduciary duties to its stockholders under applicable Law; provided, however, that any such action or statement or disclosure made

---

[76] *Id*. at A464 (Merger Agreement § 4.02(d)) (emphases added).

pursuant to clause (i) or clause (ii) shall be deemed to be a Company Adverse Recommendation Change *unless the Board of Directors of the Company reaffirms its recommendation in favor of the Merger in such statement or disclosure or in connection with such action.*[77]

On appeal, ETE argues that the above-described statements constituted a Company Adverse Recommendation Change under Sections 3.01(d) and 4.02 of the Merger Agreement. But as the Court of Chancery held, ETE's reading of these provisions was unreasonable.

The Court of Chancery properly applied Delaware contract interpretation principles and determined that the Company Board Recommendation refers to the four particular *resolutions* the Williams Board was required to adopt in favor of the Merger. The grammatical construction of Section 3.01(d) is illustrative.[78] In Sections 3.01(d), the noun "resolutions" gives meaning to the four adjectival phrases that follow to form the definition "Company Board Recommendation." Further, the dependent clause concluding the definition—which begins with the phrase "which resolutions"—explicitly denotes that that Company Board Recommendation consists of resolutions. There is no language that would suggest the Company Board Recommendation is meant to be an expansive term or include anything other than

---

[77] *Id.* at A464–65 (Merger Agreement § 4.02(f)) (emphases added).
[78] *See ITG Brands, LLC v. Reynolds Am., Inc.*, 2019 WL 4593495, at *4 (Del. Ch. Sept. 23, 2019) (citations omitted) ("In discerning the plain meaning of a contract, the court may look to the grammatical construction of a contractual provision.").

the resolutions.[79]  Accordingly, we agree with the Court of Chancery that this Section, along with Section 4.02, is clear on its face.  Because ETE did not allege that Williams withdrew, modified, or qualified the Company Board Recommendation under Section 4.02(d) through the Closing Date, its claim necessarily fails.

ETE separately argues that the Court of Chancery's interpretation of Section 4.02(d) and 3.01(d) would render Section 4.02(f) "inexplicable and rank surplusage."[80]  We disagree.  The Court of Chancery correctly observed that ETE misunderstands how Sections 4.02(d) and 4.02(f) interact.  Because Section 4.02(d) is a fiduciary-out provision that prohibited certain *board* actions, while Section 4.02(f) is a safe harbor provision that permitted certain *company* disclosures if certain conditions were met, Williams need not rely on the safe harbor to prevail against ETE's counterclaim.[81]  By its plain language, Section 4.02(f) is not a safe harbor for making a modification or qualification of the Company Board Recommendation.  Because ETE does not allege that Williams made any statements in connection with the exercise of a fiduciary out, Section 4.02(f) is not applicable.

---

[79] ETE's approach is further contradicted by the Merger Agreement's own rules of interpretation, which indicate that the use of "[t]he words 'hereof', 'herein' and 'hereunder' . . . shall refer to this Agreement as a whole and not to any particular provision of this Agreement."  App. to Opening Br. at A488 (Merger Agreement § 8.04 (b)).  It could have, for example, used the word "included," which under Section 8.04 is "deemed to be followed by the words 'without limitation.'"  *Id.*

[80] Opening Br. at 41; *see also* Reply Br. at 5–6, 9.

[81] *See* App. to Answering Br. at B3600–01.

We also separately observe that the public statements that ETE claims constitute a modification of the Company Board Recommendation include a reaffirmation by the Williams Board that it was committed to completing the Merger.[82] Even if we found that these types of statements were the cause, or even related to, ETE's exercise of its right to avoid the Merger, the statements themselves

---

[82] *See* App. to Opening Br. at A1172 (May 16, 2016 Amendment No. 7 to Form S-4) ("As of the date of this proxy statement/prospectus, a majority of the WMB Board continue to recommend a vote 'FOR' the Merger Proposal."); *id.* at A1174 (May 26, 2016 Amendment No. 8 to Form S-4) ("As of the date of this proxy statement/prospectus, a majority of the [Williams] Board continue to recommend a vote 'FOR' the Merger Proposal."); *id.* at A1659 (Williams April 6, 2016 Press Release) ("The Williams Board is unanimously committed to enforcing its rights under the merger agreement entered into with ETE on September 28, 2015 and to delivering the benefits of the merger agreement to its stockholders. . . . Williams looks forward to completing the transaction and delivering its benefits to the Company's stockholders. The Williams Board has not changed its recommendation 'FOR' the merger agreement executed on September 28, 2015."); *id.* at 1662 (Williams April 14, 2016 Press Release) ("The Williams Board is unanimously committed to enforcing its rights under the merger agreement entered into with ETE on September 28, 2015 and to delivering the benefits of the merger agreement to Williams' stockholders. . . . Williams looks forward to completing the transaction and delivering its benefits to the Company's stockholders. The Williams Board has not changed its recommendation 'FOR' the merger agreement executed on September 28, 2015."); *id.* at 1665 (Williams May 13, 2016 Press Release) ("The Williams Board is unanimously committed to enforcing Williams' rights under the Merger Agreement entered into with ETE on September 28, 2015 and to delivering the benefits of the Merger Agreement to Williams' stockholders. This action was filed with that goal in mind. The Williams Board has not changed its recommendation 'FOR' the Merger Agreement executed on September 28, 2015."); *id.* at A1769, 1799 (Williams' Texas Litigation Complaint at ¶¶ 62, 177) ("Williams has taken all steps necessary and required under the Merger Agreement to consummate the Proposed Transaction;" "[Williams] has fulfilled its obligations under the Merger Agreement and is prepared to continue toward the consummation of the Proposed Transaction."); C.A. No. 12168, Dkt. 48 (First Merger Action Am. Compl. ¶ 10) ("By contrast, Williams has taken all steps necessary and required under the Merger Agreement to consummate the Proposed Transaction."); C.A. No. 12337, Dkt. 1 (Second Merger Action Compl. ¶ 41) ("By contrast, Williams has made every effort to have the Registration Statement declared effective, to enable counsel for Defendants to issue the 721 Opinion, to close the Proposed Transaction and to avoid this lawsuit. Despite these best efforts, Defendants' obstructionist conduct has left Williams with no choice but to bring this action in order to protect its rights, negotiated for the benefit of Williams' stockholders, under the Merger Agreement.")

do not appear to qualify the Company Board Recommendation. And in any case, ETE does not and cannot rebut the undisputed facts that Williams sued ETE to compel the consummation of the Merger, that the Williams Board never acted formally to withdraw the resolutions and affirmed the Company Board Recommendation several times during the pendency of the Merger, and that an overwhelming majority of Williams' shareholders voted in favor of the Merger.

For the foregoing reasons, there is no reasonable reading of Sections 3.01(d) and 4.02(d) that supports ETE's argument that it is entitled to the $1.48 billion Termination Fee for adversely modifying the Company Board Recommendation.

B. *The Court of Chancery Did Not Err in Finding that Williams Did Not Breach the Merger Agreement*

ETE's next argument is that the Court of Chancery erred in awarding Williams the $410 million WPZ Termination Fee Reimbursement. ETE argues that Williams materially breached the Merger Agreement in multiple respects and is therefore not entitled to the reimbursement. ETE asserted this argument through three affirmative defenses presented at trial. First, ETE argues that Armstrong's interactions with Bumgarner (as well as other of his actions) breached Sections 5.03(a) and 4.01(b) of the Merger Agreement (the Efforts Obligations). Next, ETE contends that the Court of Chancery erred by not drawing an adverse inference that Williams was in breach of the Merger Agreement due to Armstrong's spoliation. ETE finally charges that the Court of Chancery erred in finding that Williams' refusal to cooperate with ETE's

31

financing efforts satisfied the Capital Structure Representation, Section 5.14 of the Agreement. We review the Court of Chancery's findings for clear error.[83] Errors of law are reviewed *de novo*.[84]

> 1. The Court of Chancery Did Not Err in Finding that Williams Did Not Breach the Merger Agreements' Efforts Obligations

ETE first argues that the Court of Chancery erred in finding that Williams did not breach the Efforts Obligations and the Ordinary Course Covenant provisions of the Merger Agreement. Section 5.03(a) provided that the parties were to use "reasonable best efforts" to consummate the merger, including the "taking of all acts necessary to cause the conditions to Closing to be satisfied as promptly as practicable" and cooperating with each other to "contest and resist any . . . litigation" challenging the merger.[85] Section 4.01(a) required Williams to "carry on its business in the ordinary course."[86] ETE contends that Armstrong's actions fell far short of what these provisions required and thus were material breaches of the Agreement. We disagree.

---

[83] *Backer v. Palisades Growth Cap. II. L.P.*, 246 A.3d 81, 94-95 (Del. 2021). We give substantial deference to factual determinations based on live testimony. *Schock v. Nash*, 732 A.2d 217, 224 (Del. 1999).

[84] *Boyer v. Poole*, 815 A.2d 348 (Del. 2003).

[85] App to Opening Br. at A468 (Merger Agreement § 5.03(a)).

[86] *Id.* at A456 (Merger Agreement § 4.01(a)).

### a. Armstrong's Actions Did Not Constitute a Material Breach of Williams' Efforts Obligations

ETE's first argument is that the Court of Chancery failed to find that certain actions Armstrong took during the period between signing and closing amounted to a clandestine campaign to sabotage the Merger and thus were a breach of the Efforts Obligations.[87] Specifically, ETE argues that the Court of Chancery committed an error of law by reading an intent requirement into the provisions at issue to determine that Armstrong's communications were intended to assuage Bumgarner's concerns about the synergies estimates, not to thwart the Merger.[88] The court did no such thing. Rather, it carefully weighed the evidence and evaluated Armstrong and Bumgarner's credibility at trial in reaching its finding that Armstrong's actions did not constitute a breach of the Merger Agreement.

The Court of Chancery relied on extensive trial testimony from Armstrong and Bumgarner in concluding that Armstrong's actions did not breach the Efforts Obligations. Armstrong and Bumgarner, as friends and former colleagues, communicated frequently. When Bumgarner took issue with certain synergy estimates provided in a joint press release, Armstrong sought to leverage their relationship to ward off a legal fight with Bumgarner.[89] Armstrong explained that

---

[87] Opening Br. at 44.
[88] *Id*. at 46.
[89] *Chancery Post-Trial Opinion* at *18.

he limited the number of people who were aware of these interactions in order to manage the situation with Bumgarner himself and avoid the matter escalating into a "very aggressive fight.'"[90] Although Bumgarner then filed a lawsuit, his claims were all dismissed or settled prior to the closing date.[91] Both Armstrong and Bumgarner testified that Armstrong did not assist with the lawsuit and sought to discourage Bumgarner from filing it in the first place.[92] The court also credited testimony from Bumgarner that Armstrong "played it straight," "behaved like a Boy Scout," and "represented the Company" in their discussions.[93]

The Merger Agreement did not enumerate specific steps a party had to take in response to litigation beyond requiring them to take "reasonable best efforts to contest and resist any such litigation."[94] So it was reasonable for Armstrong to have sought to leverage his personal and professional relationship with Bumgarner. In retrospect, this proved to be successful as the litigation was resolved prior to the closing date. There is sufficient evidentiary support in the record for the Court of Chancery's finding that Armstrong sought to head off Bumgarner's lawsuit and

---

[90] *Id.*
[91] *See* App. to Opening Br. at A744 (*Bumgarner v. Williams* Class Action Complaint); *Bumgarner*, 2016 WL 1717206, at *6; App. to Answering Br. at B3352 (*Bumgarner v. Williams* Settlement Agreement).
[92] *See id.* at A3721 (Armstrong Tr.) ("I did not try to help him with his lawsuit by any stretch of the imagination."); *id.* at A4066–67 (Bumgarner Tr.) ("[H]e didn't like the idea of Williams being sued. . . . [H]e said we didn't have a very good case.").
[93] *Chancery Post-Trial Opinion* at *19.
[94] App. to Opening Br. at A468 (Merger Agreement § 5.03(a)).

Armstrong's actions were in furtherance of the merger and in satisfaction of Williams' obligation to "contest and resist" adverse litigation.

### b. None of Armstrong's or Williams' Other Actions Materially Breached the Agreement

ETE also claims that several other of Armstrong's and Williams' actions constituted material breaches of the Agreement. But this argument fairs no better, as the Court of Chancery's well-founded factual findings show otherwise.

First, ETE contends that Armstrong encouraged two swing vote directors, Cleveland and Stoney, to oppose the deal. But the Court of Chancery found that this was not the case. As the court noted, "ETE introduced no evidence that Cleveland or Stoney felt pressured to switch their votes; on the contrary, Stoney testified that she never felt pressure to reconsider her position."[95]

Second, ETE contends that Armstrong positioned Williams for a "walkaway payment," but this does not overcome the actions Williams took to effectuate the Merger.[96] As the trial court found, "although Williams did ask its financial advisors to assess the value of a potential breakup fee from ETE, the Williams Board resolved to support the Merger publicly, and ultimately sued to enjoin ETE from terminating the Merger Agreement."[97]

---

[95] *See Chancery Post-Trial Opinion* at *34.
[96] Opening Br. at 50.
[97] *Chancery Post-Trial Opinion* at *34.

Third, ETE charges Armstrong with "'working the press' to write anti-ETE articles," but this stems solely from an email from one of Williams' attorneys at Cravath to Williams personnel, highlighting ETE's attempt to turn hostile on the deal.[98]  In an email sharing news coverage of ETE's "attempts to back out" of the Merger, Williams' financial advisors at Lazard expressed relief that "[f]inally someone is throwing the [] flag on what ETE is doing."[99]  Van Ngo responded with "Yes.  We've been working the press on this."[100]  ETE's argument is essentially that Williams, by calling out ETE's own actions in opposition to the Merger, breached its obligations to use best efforts to close the Merger.  Not only is this not persuasive, but it stands against the Court of Chancery's finding that Williams took affirmative steps to attempt to close the Merger.[101]

Fourth, ETE takes issue with Williams' lawsuit against Warren for tortious interference stemming from the Preferred Offering, characterizing it as "thinly-veiled publicity stunt."[102]  The Court of Chancery, however, rejected this claim, noting that "ETE has introduced no evidence that Williams' Texas lawsuit . . . was intended to be a 'publicity stunt.'"[103]  "Instead," the court continued, "the lawsuit represented Williams' view that the Preferred Offering breached the Merger

---

[98] Opening Br. at 50; *see* App. to Opening Br. at A889–90.
[99] App. to Opening Br. at A889–90.
[100] *Id.*
[101] *See Chancery Post-Trial Opinion* at *34.
[102] Opening Br. at 50.
[103] *See Chancery Post-Trial Opinion* at *34.

36

Agreement and was unfair to Williams stockholders."[104] ETE nevertheless continues to try to characterize the lawsuit as part of a smear campaign, but it continues to miss the mark. As support, it points to how the complaint in that action referred to Warren as being "malicious."[105] ETE ignores that legal malice is an element of tortious interference under Texas law.[106] The complaint did not call Warren "malicious" but rather that he acted with malice in satisfaction of the legal elements of its claim for tortious interference.[107] ETE also contends that "were this *not* a publicity stunt, Williams would have refiled it after the Texas court dismissed it for violating the Merger Agreement's forum-selection clause."[108] Williams, however, does not have the burden of proving a negative. The burden of proof for an affirmative defense is on ETE, and it failed to carry that burden.[109]

In the end, ETE has little response to the undisputed facts that the Williams Board resolved to support the merger, garnered stockholder approval for the deal,

---

[104] *Id.*

[105] Opening Br. at 51.

[106] *See Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998) ("The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss."); *Cont'l Coffee Prod. Co. v. Cazarez*, 937 S.W.2d 444, 452 (Tex. 1996) ("[L]egal malice . . . exists when wrongful conduct is intentional and without just cause or excuse.").

[107] *See, e.g.*, App. to Opening Br. at A991 (*Williams v. Warren* Complaint) ("Mr. Warren tortiously interfered with the Merger Agreement when he willfully, intentionally[,] and maliciously orchestrated the Special Offering with the purpose and effect of siphoning value to himself and away from Williams' stockholders and ETE's other common unitholders, in breach of the Merger Agreement.").

[108] Opening Br. at 51 (emphasis in the original).

[109] *Medek v. Medek*, 2008 WL 4261017, at *10 (Del. Ch. Sept. 10, 2008) ("Defendants have the burden of proof on each of their affirmative defenses.").

and sued to enjoin ETE from terminating the transaction. Thus, we see no error in the Court of Chancery's conclusion that ETE failed to prove that Williams materially breached the Efforts Obligations and therefore is entitled to the $410 million WPZ Termination Fee Reimbursement. Accordingly, we do not reach or address the Court of Chancery's alternative holding that even if there were breaches of these provisions, they were cured at the time of the Closing Date.[110]

2. The Court of Chancery Did Not Abuse Its Discretion by Declining to Draw an Adverse Inference that Williams Breached the Merger Agreement

ETE next argues that the Court of Chancery erred by declining to draw an adverse inference that Williams breached the Merger Agreement due to Armstrong's spoliation of evidence. It claims that the sanction imposed—fees and costs connected with subpoenaing Bumgarner's emails and bringing a discovery motion—was "barebones."[111]

We review a trial court's imposition of a discovery sanction for abuse of discretion.[112] The Court of Chancery has broad discretion to fashion and impose discovery sanctions.[113] "To the extent a decision to impose sanctions is factually based, we accept the trial court's factual findings so long as they are sufficiently

---

[110] *See Chancery Post-Trial Opinion* at *34.
[111] Opening Br. at 54.
[112] *See Genger v. TR Invs., LLC*, 26 A.3d 180, 190 (Del. 2011).
[113] *Id.*

supported by the record, are the product of an orderly and logical reasoning process, and are not clearly erroneous."[114]

"Although we do not condone [Armstrong's] intransigence,"[115] the Court of Chancery did not abuse its discretion in declining to draw an adverse inference here. The Court of Chancery appropriately considered the remedial, punitive, and deterrence goals sanctions serve[116] and the factors of culpability, prejudice, and fairness that determine the appropriateness of sanctions.[117] It then weighed the lack of prejudice to ETE against Armstrong's culpability and Williams' right to a fair proceeding, and found that an award of monetary sanctions was sufficient under the circumstances;[118] namely that Williams had provided substantial evidence that any emails from Armstrong's deleted account were recoverable from Bumgarner's account and that Armstrong did not recall any other emails between himself and Bumgarner. In addition, the court observed that to the extent Armstrong emailed any other individuals identified by ETE, such emails could be recovered by subpoenaing

---

[114] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citation omitted).

[115] *Zachman v. Real Time Cloud Servs. LLC*, 251 A.3d 115, 2021 WL 1561430, at *5 (Del. 2021) (TABLE).

[116] *See Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1189 (Del. Ch. 2009) ("Sanctions serve three functions: a remedial function, a punitive function, and a deterrent function.")

[117] *See id.*, 981 A.2d at 1189 ("[T]he Court will consider . . . (1) the culpability or mental state of the party who destroyed the evidence; (2) the degree of prejudice suffered by the complaining party; and (3) the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the conduct in the future."); *see also TR Invs., LLC v. Genger*, 2009 WL 4696062, at *18 (Del. Ch. Dec. 9, 2009), *aff'd*, 26 A.3d 180 (Del. 2011).

[118] *Chancery Post-Trial Opinion* at *35–36.

the receiver.[119]   ETE repeatedly argues that the Court of Chancery misapplied the burden of proof when it came to proving that ETE was not prejudiced, but regardless of the allocation of the burden, the factual findings support the sanction that the trial court awarded.

### 3. The Court of Chancery Did Not Err in Find Finding that Williams Did Not Breach the Merger Agreement's Financing Cooperation Provision

ETE lastly argues that Williams materially breached Section 5.14 of the Merger Agreement—the Financing Cooperation Provision—by refusing to consent to ETE's Proposed Public Offering.  Section 5.14 requires Williams to "provide cooperation reasonably requested by [ETE] that is necessary or reasonably required in connection" with the financing of the transaction.[120]  The Court of Chancery did not commit clear error in holding that Williams' refusal to consent to the Proposed Public Offering was not a breach of the Merger Agreement, as it found that:  (1) Section 5.14 contained a reasonableness qualifier; and (2) ETE's request was unreasonable given the unfair impact of the offering on Williams' shareholders.[121]

---

[119] *Id.* at *35.
[120] App. to Opening Br. at A476 (Merger Agreement § 5.14).
[121] *See Union Oil Co. of California v. Mobil Pipeline Co.*, 2006 WL 3770834, at *11 (Del. Ch. Dec. 15, 2006) (finding that a party "acted well within the relevant confines of reasonableness as courts have understood it in [the merger] context, which is that a party may properly withhold consent to a transaction when the decision is made for a legitimate business purpose—i.e., where it has a legitimate concern over the buyer's financial abilities").

ETE first argues that the reasonableness qualifier only attaches to its request itself, such that if the "requested cooperation [is] *de minimis*" in terms of the effort required, the duty to cooperate is absolute.[122] Because its request was ministerial in nature, and because Williams' duty to cooperate is not qualified by an "any-legitimate-business-purpose out," ETE argues that Williams had no choice but to comply with its request.[123] But such a reading would lead to an absurd outcome; namely, that Williams could be forced to engage in conduct that would potentially be damaging to the company or its shareholders.

Further, the Court of Chancery's well-grounded factual findings demonstrate that ETE's request was patently unreasonable. As the court points out, the Proposed Public Offering excluded Williams' shareholders, and Williams' financial advisors counseled the company to withhold its consent precisely for this reason.[124] The Court of Chancery also found that Williams, instead of immediately withholding its consent, offered to proceed with the offering if ETE allowed Williams' shareholders to participate.[125] But ETE refused.[126] And crucially, the Proposed Public Offering violated the Merger Agreement. "[A]n obligation to take reasonable actions . . . does not require a party 'to sacrifice its own contractual rights for the benefit of its

---

[122] Opening Br. at 57.
[123] Reply Br. at 20.
[124] *Chancery Post-Trial Opinion* at *33.
[125] *Id.*
[126] *Id.*

counterparty.'"[127]  The Court of Chancery did not clearly err in finding that Williams did not breach Section 5.14 of the Merger Agreement.

C. *The Court of Chancery Did Not Err in Finding that the Parent Disclosure Letter's $1 Billion Equity Exception Did Not Apply to ETE's Preferred Offering*

ETE's third argument on appeal is that the Court of Chancery erred in finding that the Parent Disclosure Letter's $1 Billion Equity Exception provision—Section 4.01(b)(v)—did not apply to ETE's Preferred Offering, and thus did not excuse ETE's material breach of the Ordinary Course Covenant and the Interim Operating Covenants.  We review unambiguous contract language *de novo*.[128]  That said, "[t]o the extent the trial court's interpretation of contract language rests on findings concerning extrinsic evidence, . . . this Court must accept those findings unless they are unsupported by the record and are not the product of an orderly and logical deductive process."[129]

Under the Merger Agreement, the Ordinary Course Covenant and the Interim Operating Covenants are subject to exceptions "set forth in Section 4.01(b) of the Parent Disclosure Letter."[130]  Section 4.01(b) of the PDL organizes these exceptions

[127] *Williams Field Servs. Grp., LLC v. Caiman Energy II*, LLC, 2019 WL 4668350, at *34 (Del. Ch. Sept. 25, 2019), *aff'd sub nom. Williams Field Servs. Grp., LLC v. Caiman Energy II, LCC*, 237 A.3d 817 (Del. 2020) (quoting *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *91 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018)).
[128] *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1181 (Del. 1992) (citation omitted).
[129] *Id.* (citation omitted).
[130] App. to Opening Br. at A460 (Merger Agreement §4.01(b)).

under headers that correspond to specific sections within Section 4.01(b) of the Agreement. The Parent Disclosure Letter states that "[t]he headings contained in this Parent Disclosure Letter are for reference only and shall not affect in any way the meaning or interpretation of this Parent Disclosure Letter."[131] The $1 Billion Equity Issuance Exception falls under a header titled "Section 4.01(b)(v)."[132] The Merger Agreement includes a savings clause stating that the disclosures in any section of the Parent Disclosure Letter apply to the corresponding section of the Merger Agreement, as well as to any other section of the Agreement so long as the "relevan[ce]" to the other section "is reasonably apparent on its face":

> [A]ny information set forth in one Section or subsection of the Parent Disclosure Letter shall be deemed to apply to and qualify the Section or subsection of this Agreement to which it corresponds in number and each other Section or subsection of this Agreement to the extent that it is reasonably apparent on its face in light of the context and content of the disclosure that such information is relevant to such other Section or subsection[.][133]

The Court of Chancery concluded that Section 4.01(b)(v) of the Parent Disclosure Letter is ambiguous as to whether it applied to the Preferred Offering. The court then looked to extrinsic evidence and found that it did not. Accordingly, because Section 4.01(b)(v) of the Merger Agreement prohibits ETE from issuing

---

[131] *Chancery Post Trial Opinion* at *29.
[132] *Id.*
[133] App. to Opening Br. at A445 (Merger Agreement § 3.02).

equity between signing and closing, the court found that ETE was in breach. We defer to the Court of Chancery's factual findings, including its determinations about extrinsic evidence,[134] and accept them here, as they are supported by the record and are the product of an orderly and logical deductive process.[135]

### 1. ETE's Contentions

ETE argues that Section 4.01(b)(v) of the Parent Disclosure Letter is clear and unambiguous on its face. ETE specifically contends that the Court of Chancery misinterpreted the Merger Agreement and Parent Disclosure Letter, which together, in ETE's view, make clear that the $1 Billion Equity Issuance Exception in Section 4.01(b)(v) applies to all of Section 4.01(b) and is not limited in application to the corresponding section in the Merger Agreement.

ETE first points to the qualifying preambles to both the Ordinary Course Covenant and the Interim Operating Covenants and argues that refusing to cross-apply the PDL exceptions contradicts the plain meaning of the agreement and results in surplusage since there are no corresponding exceptions to the Ordinary Course Covenant. It then turns to language in Section 3.02 of the Merger Agreement that it claims allows for application of the PDL to "all provisions . . . to which 'it is

---

[134] *See Textron Inc. v. Acument Glob. Techs., Inc.*, 108 A.3d 1208, 1223 (Del. 2015) (finding that a trial court's review of extrinsic evidence "is entitled to deference on appeal").
[135] *See Sonitrol Holding Co.*, 607 A.2d at 1181.

44

reasonably apparent' that the disclosure 'is relevant.'"[136]  ETE draws a distinction based on the use of "equity securities" in Section 4.01(b)(v) of the PDL rather than the use of the term "Common Units."[137]  According to ETE, the use of the broader term "equity securities" rather than the narrower term "Common Units" was purposeful.  If ETE was limited to only issuing pre-existing classes of securities that did not require amendments to its partnership agreement, then it was effectively being limited to issuing only common units.  ETE argues that if this was the case it would result in a "complete rewrite of the parties' agreement."[138]

## 2. Williams' Contentions

Williams also argues that Section 4.01(b)(v) of the Parent Disclosure Letter is unambiguous.  More pointedly, it argues that the $1 Billion Equity Issuance Exception applies only to the operating covenant in the corresponding Section 4.01(b)(v) of the Agreement.[139]  Its interpretation, Williams notes, matches the structure of the PDL, which lists the exceptions to a given section or subsection of the Agreement beneath a reference to that section or subsection number.[140]  It also points to Section 3.02 of the Merger Agreement, which it claims "expressly sets out how to read the two contractual documents together."[141]

---

[136] Opening Br. at 64 (quoting App. to Opening Br. at A445 (Merger Agreement § 3.02)).
[137] Opening Br. at 64–65.
[138] *Id.* at 65.
[139] Answering Br. at 56.
[140] *Id.* at 57.
[141] *Id.* (citing App. to Opening Br. at A445 (Merger Agreement § 3.02)).

45

### 3. The Court of Chancery's Findings

The Court of Chancery concluded that the "except as set forth in Section 4.01(b) of the Parent Disclosure Letter" qualifier in the Merger Agreement was ambiguous.[142] Contractual ambiguity exists "'[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.' Where a contract is ambiguous, 'the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.'"[143] The court found that both parties' interpretations were reasonable for the reasons the parties provided.[144]

### 4. The Plain Language and Structure of the PDL and Merger Agreement

A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.[145] As discussed below, we agree with the Court of Chancery's determination that the relevant provisions of the PDL and Merger Agreement are ambiguous as to whether the $1 Billion Equity Issuance Exception applies.

---

[142] *Chancery Post-Trial Opinion* at *28.
[143] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) (quoting *GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997))).
[144] *Chancery Post-Trial Opinion* at *29.
[145] *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

Section 4.01(b)(v) of the Parent Disclosure Letter states that "[ETE] may make issuances of equity securities with a value of up to $1.0 billion in the aggregate."[146]  Although this would, on its face, appear to excuse the Preferred Offering, which fell below the $1 billion limit, the exception is located under the sub-header Section 4.01(b)(v), suggesting that it is only an exception to Section 4.01(b)(v) of the Merger Agreement—which prohibits ETE from issuing equity between signing and closing.  If Section 4.01(b)(v) of the PDL only applied to this covenant, then ETE's breach of the other Interim Operating Covenants contained in Section 4.01(b) of the Agreement would not be excused.  If, on the other hand, Section 4.01(b)(v) applied to *all* of Section 4.01(b), then ETE's breach would be excused in its entirety, and Williams would not be entitled to the WPZ Termination Fee Reimbursement.

We begin with Williams' reading—that the $1 Billion Equity Issuance Exception in the PDL only modifies the prohibition on equity issuances in Section 4.01(b)(v) of the Agreement.  We first note that that each of the headers used in the Parent Disclosure Letter correspond with a single covenant in the Merger Agreement.  A reasonable reading of this drafting structure is that by placing the $1 Billion Equity Issuance Exception under the Section 4.01(b)(v) header, the exception was intended to be exclusive to that section.  Williams' interpretation also finds

---

[146] App. to Opening Br. at A413.

support in Section 3.02 of the Merger Agreement, which provides that "any information set forth in one Section or subsection of the Parent Disclosure Letter shall be deemed to apply to and qualify the Section or subsection of this Agreement to which it corresponds in number[.]"[147]

We then turn to ETE's reading—under which the $1 Billion Equity Issuance Exception applies to Section 4.01(b) in its entirety. Its reading finds support under Section 8.04 of the Agreement. It provides that "[t]he table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement[,]"[148] indicating that the headings used in the Parent Disclosure Letter were not intended to limit the cross-sectional force of the exceptions therein. Further supporting ETE's interpretation, Section 3.02 of the Merger Agreement stipulates that any information in the Parent Disclosure Letter applies to "each other Section or subsection of this Agreement to the extent that it is reasonably apparent on its face in light of the context and content of the disclosure that such information is relevant to such other Section or subsection[.]"[149]

Given that one could reasonably read Section 4.01(b)(v) of the PDL to apply to Section 4.01 of the Merger Agreement in its entirety *or* only to Section 4.01(b)(v)

---

[147] *Id.* at A445 (Merger Agreement § 3.02).
[148] *Id.* at A488 (Merger Agreement § 8.04(a)).
[149] *Id.* at A445 (Merger Agreement § 3.02).

of the Merger Agreement, we agree with the trial court that Section 4.01(b)(v) of the PDL is ambiguous. Thus, the Court of Chancery properly undertook a review of the extrinsic evidence.[150]

### 5. Extrinsic Evidence

Where a contract is ambiguous, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions."[151] We do so by employing a well-settled standard:

> If the contract is ambiguous, a court will apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry. After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation.[152]

Here the court found, through a logical and orderly deductive process, that the extrinsic evidence weighed in favor of Williams' interpretation, relying heavily on testimony from both parties' witnesses that "[u]p until the day before signing, the $1 Billion Equity Issuance Exception was located within Section 4.01(b)(v) of the Merger Agreement, not the Parent Disclosure Letter."[153] And the court pointed to

---

[150] *See Salamone v. Gorman*, 106 A.3d at 374 (citations and internal quotation marks omitted).
[151] *See id.* at 369 (citations omitted).
[152] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) (alterations in original) (citations and internal quotation marks omitted).
[153] *Chancery Post-Trial Opinion* at *29.

the testimony of Minh Van Ngo, Williams' lead-deal attorney, who testified that, at the time the change was made, his team at Cravath informed Wachtell, ETE's counsel, "that we were fine with th[e] movement, with the understanding that it was nonsubstantive," meaning, "just like it operate[d] if it were in the body of the merger agreement, . . . the exceptions in the disclosure schedule would apply only to the corresponding section of the merger agreement."[154]

For its part, ETE argues that testimony from Chappel, Williams' CFO, is extrinsic evidence in its favor. He testified that a goal of the equity issuance exception was to offer "some flexibility in dealing with the capital markets."[155] ETE construes this as a blank check and believes that the court "did not—and could not— square its reading" with this testimony.[156] But ETE misses the fact that the $1 Billion Equity Issuance Exception *did* provide flexibility by allowing issuances of existing classes of equity up to a value of $1 billion. Chappel also provided testimony, which according to ETE, "admitted that ETE's interpretation of the interplay between the disclosure letters and Merger Agreement was correct."[157] Specifically, Chappel commented on three exceptions in Williams' Company Disclosure Letter that cross-applied to non-corresponding Merger Agreement provisions.[158] But each of these

---

[154] *Id.* at *9.
[155] App. to Opening Br. at A3171 (Chappel Tr.).
[156] Opening Br. at 66.
[157] *Id.* at 67.
[158] *See* App. to Opening Br. at A3164–70 (Chappel Tr.) (stating that Section 4.01(a)(ix) of the CDL is an exception to Williams' ordinary course covenant; CDL Section 4.01(a)(v) is an exception to

would have been permissible under the "reasonably apparent on its face" language of Section 3.02.[159] Chappel's testimony is not the "admission" ETE hopes.

There was sufficient record evidence, in our view, supporting the Court of Chancery's reasoned determination that Section 4.01(b)(v) of the PDL was intended to qualify the covenants within Section 4.01(b)(v) of the Merger Agreement, but not the other Interim Operating Covenants or the Ordinary Course Covenant. We therefore defer to that finding.

D. *The Court of Chancery Did Not Abuse Its Discretion in Finding that Williams' Attorney's Fees Were Reasonable*

ETE's final argument is that the Court of Chancery incorrectly approved an $85,440,716.36 million attorney's fees award (including prejudgment interest compounded quarterly) under a contractual fee-shifting provision in the Agreement. Principally, ETE argues that such an award was unreasonable because the Court of

---

Section 4.01(a)(iv) of the Merger Agreement; and CDL Section 4.01(a)(ix) is an exception to Section 4.01(a)(vi) of the Merger Agreement).

[159] CDL Section 4.01(a)(v) allowed Williams to issue securities up to $1 billion in value in order to purchase WPZ units, and this necessarily applied to Section 4.01(a)(iv) of the Merger Agreement, which restricted Williams' ability to acquire shares in its subsidiaries. *See* App. to Opening Br. at A379; *id.* at A457. CDL Section 4.01(a)(ix) allowed Williams to abandon properties not exceeding $100 million in value. *See id.* at A380. This exception necessarily applied to the ordinary course covenant, under which disposition of such properties would not be ordinary course. *See id.* at A3165 (Chappel Tr.) (agreeing that abandoning an asset of up to a hundred million dollars would not be an event in the ordinary course of Williams). CDL Section 4.01(a)(ix) also allowed Williams to dispose of properties in connection with drop transactions to WPZ. *See id.* at A380. Drop down transactions, however, may "have required amendments to both WPZ and [Williams'] organizational documents," meaning that this exception also necessarily applied to Section 4.01(a)(vi) of the Merger Agreement, which prohibited amendment of organizational documents. *Id.* at A3168 (Chappel Tr.); *see id.* at A457.

Chancery shifted a contingent fee. An award of attorney's fees is reviewed for abuse of discretion.[160] This Court "conducts a highly deferential abuse-of-discretion review by keeping in mind the nonexhaustive factors of Rule 1.5(a) of the Delaware Lawyer's Rules of Professional Conduct."[161] And "[w]hile we review an award of attorne[y's] fees for abuse of discretion, we review the trial court's interpretation of a contractual fee-shifting provision *de novo*."[162]

Section 5.06(g) addresses fee shifting under the Merger Agreement:

> [I]f . . . Parent fails promptly to pay any amount due pursuant to Section . . . 5.06(f), and, in order to obtain such payment, . . . the Company commences a suit that results in . . . a judgment against Parent for the amount set forth in Section . . . 5.06(f) . . . ***Parent shall pay to the Company . . . the other party's costs and expenses (including reasonable attorneys' fees and expenses) in connection with such suit, together with interest*** on the amount of such payment from the date such payment was required to be made until the date of payment at the prime rate as published in the Wall Street Journal in effect on the date such payment was required to be made.[163]

Under this provision, ETE was required to pay Williams attorney's fees and expenses because of Williams' successful suit to collect the $410 million WPZ Termination Fee Reimbursement. The wrinkle here is that, in 2017, Williams and

[160] *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011); *see also RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 876 (Del. 2015); *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 266 (Del. 2022).

[161] *Bako Pathology LP*, 288 A.3d at 279 (citing *TransPerfect Global, Inc. v. Pincus*, 278 A.3d 630, 653 (Del. 2022) (internal quotations, citations, and brackets omitted).

[162] *Id.* at 266–67 (internal quotations, citations, and brackets omitted).

[163] App. to Opening Br. at A474 (Merger Agreement §5.06(g)) (emphasis added).

its counsel Cravath switched to a contingency fee arrangement entitling Cravath to a 15% award on the WPZ Termination Fee Reimbursement judgment if Williams prevailed. Accordingly, the Court of Chancery calculated Williams' fee award based on the contingency agreement.

ETE argues that the Court of Chancery's fee award amounts to a misinterpretation of Section 5.06(g), because at the time the parties signed the Merger Agreement in 2015, every Delaware authority that awarded attorney's fees pursuant to a contractual fee-shifting provision did so based on a reasonable-hours-billed times reasonable-rates lodestar. This uniform authority, ETE contends, reflects what would be understood by an objective, reasonable third party in interpreting the Section. We disagree. The only limitation contained in Section 5.06(g) is that the attorney's fees be reasonable, and in fee shifting cases, a judge determines whether the fees requested are reasonable.[164] For the reasons described below, we see no abuse of discretion.

The Court of Chancery largely based its reasoning on *Shareholder Representative Servs. LLC v. Shire US Holdings, Inc.*, a decision in which then-Vice Chancellor McCormick observed that "there is nothing inherently unreasonable in enforcing a contractual fee shifting arrangement to cover a contingent fee award."[165]

---

[164] *See Mahani v. Edix Media Group, Inc.,* 935 A.2d 242, 245 (Del. 2007).
[165] 2021 WL 1627166, at *2 (Del. Ch. Apr. 27, 2021), *aff'd*, 267 A.3d 370 (Del. 2021).

The *Shire* court looked to Rule 1.5(a) of the Delaware Rules of Professional Conduct, which contains eight factors Delaware courts can use to determine whether a fee award is reasonable in a fee-shifting case, [166] and concluded that "[a] one-third contingent fee arrangement is quite typical and commercially reasonable" and that "[t]here is nothing inherently unreasonable in including prejudgment interest when calculating the appropriate amount, particularly when the underlying agreement includes interest in the relevant proceeds."[167]

ETE first contends that the Court of Chancery erred in this case, and by implication in *Shire*, in looking to Rule 1.5(a) to determine the reasonableness of a fee award, because the rule does not cover contractual fee shifting and does not address the question of whether the parties in fact intended the fee-shifting provision to cover a contingency fee award. ETE's argument is without merit. As the Court of Chancery noted, the Rule explicitly contemplates contingent fees, and thus when the parties entered into the Agreement, they should have been aware that "their

---

[166] *See* Del. Lawyers' R. Prof'l Conduct 1.5(a) (listing the eight factors as: "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent").

[167] *Shire,* 2021 WL 1627166, at *2.

bargained for 'reasonableness' limitation on fee shifting did not automatically prohibit contingency fees."[168]

ETE next argues that the Court of Chancery's reliance on *Shire* was in error, because, in ETE's view, the case is functionally inapposite. This argument does not hold water. Even though *Shire* was decided before the Agreement was signed, Rule 1.5(a) existed as a guidepost.[169] Further, the circumstances in *Shire* are not so far afield from this case to deem it a poor analog. As the Court of Chancery observed, both cases involve fee-shifting provisions that do not explicitly bar contingency fees, the parties in both cases made legitimate business judgments by switching fee arrangements mid-stream, and both involve common contingency fee percentages.

There is therefore little to suggest that the contingent-fee arrangement adopted by Williams was unreasonable. Contingent fees are reasonable when they utilize a reasonable lodestar multiple and are limited to a reasonable percentage of the recovery.[170] Here Cravath produced a lodestar—hours reasonably expended times a reasonable hourly rate—of $47,116,996.73, putting its lodestar multiple at 1.7x.[171] A lodestar multiple of 1.7x, particularly when compared to the 2.5x multiple approved in *Shire*, is "on par with or less than awards [the Court of Chancery] has

---

[168] *Chancery Fee Opinion* at *3.
[169] Indeed, at that time, Delaware courts had consistently directed judges to consider the Rule when assessing a fee's reasonableness. *See, e.g.*, *Mahani*, 935 A.2d at 246.
[170] *See Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1253 (Del. 2012).
[171] *Chancery Fee Opinion* at *5.

55

previously deemed reasonable in the post-trial or advanced-stage litigation context."[172] And, as the Court of Chancery noted below, 15% "is far below the 33% contingent fee approved in *Shire* and well within the range of contingent fees that have been approved as reasonable by [the court]."[173] ETE appears to suggest that the timing of Williams' decision to change its fee arrangement was somehow untoward, but there is no record evidence that it was anything other than an exercise of Williams' business judgment.

Next, ETE challenges the awarding of quarterly compound interest rather than simple interest. Section 5.06(g) was silent on the matter and only stated that a judgment in connection with the WPZ Termination Fee Reimbursement would be due "with interest on the amount of such payment from the date such payment was required to be made until the date of payment at the prime rate."[174] ETE contends that Section 5.06(g) "should be interpreted in the same manner as Delaware's prejudgment interest statute, which similarly makes no references to compounding and 'has long been construed as providing for a simple interest calculation.'"[175]

"[A] court of equity," however, "has broad discretion, subject to principles of fairness, in fixing the rate [of pre-judgment interest] to be applied," and "[i]n the

---

[172] *Shire* at *3.
[173] *Chancery Fee Opinion* at *4.
[174] App. to Opening Br. at A474 (Merger Agreement §5.06(g)).
[175] Opening Br. at 73 (quoting *Rexnord Indus., LLC v. RHI Hldgs., Inc.*, 2009 WL 377180, at *9-10 (Del. Super. Feb. 13, 2009)); *see* 6 *Del. C.* § 2301.

Court of Chancery the legal rate is a mere guide, not the inflexible rule."[176]  Further, "the discretion to select a rate of interest higher than the statutory rate . . . includes the lesser authority to award compounding."[177]  Considering the fact that ETE and Williams were sophisticated parties who dealt in compound interest in their day-to-day operations, the court determined that this was the proper form of interest.[178]  ETE fails to show how the Court of Chancery abused its discretion by awarding quarterly compound interest.

At bottom, ETE argues that affirming the Court of Chancery's decision on this issue would constitute bad public policy for the State of Delaware.  ETE asserts that when two sophisticated parties contract to an attorney's fees provision, there is an "obvious inference" that the "reasonable rates are going to be in a traditional, reasonable rates, reasonable hours lodestar.[179]    But ETE itself admitted that this could be contracted around.[180]  Indeed, it would be poor public policy to find that it is *per se* unreasonable that a generic fee-shifting provision contains a prohibition against the shifting of contingent fees.

---

[176] *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988) (citations omitted).
[177] *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002) (quoting *Brandin v. Gottlieb*, 2000 WL 1005954, at *29 n.83 (Del. Ch. July 13, 2000)).
[178] *See Chancery Fee Opinion*, at *3 ("It is thus 'hard[ ] to imagine a corporation today that would seek simple interest on the funds it holds.'" (quoting *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 926 (Del. Ch. 1999), *as revised* (July 1, 1999))).
[179] *See* Video of Oral Argument, Delaware Courts, at 18:21–18:42 (July 12, 2023) https://tinyurl.com/4waaxdur.
[180] *Id.* at 20:10-20:18.

The Court of Chancery's award of attorney's fees and interest was not an abuse of discretion.

## III. Conclusion

For the above reasons, we conclude that the Court of Chancery correctly held that Williams did not adversely modify the Company Board Recommendation such that it would entitle ETE to the $1.48 billion Termination Fee. The Court of Chancery correctly found that Williams did not breach the Merger Agreement's Efforts Obligations. The Court of Chancery also correctly found that Section 4.01(b)(v) of the Parent Disclosure Letter did not apply to ETE's Preferred Offering, and thus was in breach of the Agreement. Finally, the Court of Chancery did not abuse its discretion in awarding Williams reasonable attorney's fees under a contractual fee-shifting provision. We therefore affirm the Court of Chancery's judgment.